**George R. BECKER, CRNA,**
**Appellant–Defendant,**

v.

**Sandra Lee PLEMMONS, Administratrix**
**of the Estate of John Plemmons, Sr.,**
**Deceased, Appellee–Plaintiff.**

No. 10A01–9112–CV–402.

Court of Appeals of Indiana,
First District.

Aug. 31, 1992.

Gregory J. Bubalo, Tracy S. Prewitt, Ogden Newell & Welch, Louisville, Ky., for appellant-defendant.

John M. Longmeyer, Louisville, Ky., Donald R. Forrest, New Albany, for appellee-plaintiff.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

George R. Becker, CRNA ("Becker") appeals from a judgment in favor of Sandra Lee Plemmons, administratrix of the Estate of John Plemmons, Sr., deceased ("Estate"), in a medical malpractice action and an award of $500,000 plus costs. We affirm.

## ISSUES

We consolidate and restate the issues on appeal as:

1. Did the trial court err in not ordering a mistrial after the Estate's cross-examination of Becker regarding his prior employment at an abortion clinic and was Becker's motion for a mistrial timely?

2. Did the trial court err in prohibiting Becker from questioning Dr. Bentz, Becker's own expert witness, regarding his past testimony in malpractice cases?

3. Did the trial court err in denying Becker's request for *ex parte* conferences with John Plemmons, Sr.'s ("Plemmons") treating physicians?

4. Was there sufficient evidence to support the jury's verdict?

## FACTS

On admission to Clark County Hospital for an elective shoulder surgery, Plemmons' medical records reflected that he had a normal EKG, chest x-ray, blood pressure, heart rate, and laboratory tests. Record at 611 (Exhibit # 1 at 3–4). Surgery was scheduled for January 13, 1986. Dr. Karia, Dr. Jimenez, and Becker, a Certified Registered Nurse Anesthetist, were to perform the anesthesia services during the surgery which was to be performed by Dr. Gossman and Dr. Sligar. Becker, however, was the only anesthetist present throughout the entire course of Plemmons' surgery.

At 7:30 a.m., Plemmons was taken into the operating room where anesthesia was started. Record at 611 (Exhibit # 1 at 75). Prior to administering the anesthesia, Becker attached various monitors to Plemmons. One of the monitors was a Dinamap which monitors a patient's blood pressure and heart rate. A separate monitor, the Dinamap recorder, prints out a permanent record of the information. Becker started the Dinamap at approximately 7:30 or 7:31 a.m., Record at 1783, and he turned on the recorder at 7:45 a.m. Record at 1746. This time frame is consistent with the Dinamap recorder which has an elapsed time clock monitor. The first elapsed time printed on the record was 00:12, which means that at 7:45 a.m., when the record was first printed, the Dinamap monitor had been on for 12 minutes.

The Dinamap recorder's printed record shows that the Dinamap monitor was on for 58 consecutive minutes during Plemmons' surgery. At trial, Dr. Jefferies testified that the printed record show that once the Dinamap was activated at approximately 7:30 a.m., it was not turned off during the first 58 minutes of the surgery. Record at 759. Likewise, Dr. Jimenez, Becker's supervising anesthesiologist, testified that once the anesthetic was administered the Dinamap would not be turned off. Record at 1373.

Sometime between 8:16 and 8:21 a.m., 51 minutes after the Dinamap had been turned on, Plemmons had no recordable blood pressure or heart rate. Record at 721–22. Plemmons suffered a progressive lack of oxygen over the course of several minutes, resulting in his heart stopping and a total destruction of his brain from lack of oxygen. Record at 682–683. Testimony at trial attributed Plemmons' condition to Becker's failure to make sure Plemmons was "breathing properly or being breathed for properly" during surgery. *Id.* Plemmons went into cardiac arrest. The code for cardiac arrest, however, was not called until 8:30 a.m., when Becker alerted the surgery staff of Plemmons' condition. Record at 737–38. Plemmons was eventually resuscitated and stabilized. Plemmons was then taken to the Intensive Care Unit where he was pronounced brain dead, removed from his respirator, and died on January 16, 1986.

The Estate filed a proposed complaint with the Medical Review Panel, pursuant to

Indiana's Medical Malpractice Act[1], against the hospital, Dr. Karia, Dr. Jimenez, and Becker. This action was later brought only against Becker. After a jury trial, a verdict was returned finding that Becker committed an act of malpractice and awarding the Estate $500,000 in damages. On August 22, 1991, the trial court entered judgment accordingly. Thereafter, Becker filed a motion to correct error requesting a new trial, which motion was denied. Record at 537–41. Becker now appeals.

## DISCUSSION AND DECISION

*Issue One*

Becker argues that the Estate's reference to his prior employment was introduced for the sole purpose of prejudicing the jury against him and could not be remedied by an admonishment. The Estate counters that the reference was merely an attempt to demonstrate that Becker misrepresented his employment history.

■ The question of whether the conduct of counsel was so improper as to prejudice the fair conduct of the trial is within the sound discretion of the trial court, because the trial court has the advantage of observing the events and their effects at trial. *Hall–Hottel Co. v. Oxford Square Co–Op., Inc.* (1983) Ind.App., 446 N.E.2d 25, 30–31, *trans. denied; Riverside Insurance Co. v. Pedigo* (1982), Ind.App., 430 N.E.2d 796, 809. At trial, Estate attempted to inquire as to whether Becker did anesthesia in 1983 for "an abortion clinic" in the Lincoln Federal Building. Record at 1730. Before Becker stated any objection, the court interrupted and directed counsel to approach the bench. After the bench conference, the trial court admonished the jury to disregard the question. Record at 1730–31. The trial court instructed:

"The Jury will absolutely, totally disregard the last question posed by Counsel for the Plaintiff. It has no bearing on this particular case and indeed if we were to explore it further there might be

evidence that it was a complete mis-identification of where the witness was previously employed, to that extent has no function in front of this Jury. Disregard it completely."

*Id.* Any harmful effect that may have occurred was cured by the trial court's admonishment. *See Rudolph v. Landwerlen* (1883), 92 Ind. 34, 40 (abuses in argument may be sufficiently corrected by admonishment and great discretion is afforded to the trial court's decision in refusing to grant a new trial). Not having the benefit of observing the actual events and their effects at trial, we must presume that the jurors followed the trial court's comprehensive admonishment. *See Maynard v. State* (1987), Ind.App. 508 N.E.2d 1346, 1358, *trans. denied* (admonishment presumed to cure any possible prejudice).

Becker further contends that the Estate, despite the trial court's instructions to the contrary, continued to emphasize the same subject matter. The Estate complied with the trial court's instructions. During the bench conference, the trial court prohibited the Estate from using the term "abortion." Record at 1766–67. Thereafter, the Estate continued with its cross-examination, asking Becker if he was employed at EMW Women's Health Services ("EMW") in 1983 and 1987, to which Becker responded affirmatively. Record at 1731. On direct examination, however, Becker testified that upon completion of his anesthesiologist program in 1981, he worked at Norton's Hospital for two years and then he came to Clark County Hospital where he became an employee of Dueke, Fulson, Jimenez, an anesthesiology group. Record at 1489. Becker also testified that he worked at Clark County Hospital in 1984, 1985, 1986, and 1987. Record at 1711.

■ Becker has failed to show how he has been unfairly prejudiced by the Estate's questions regarding the dates he was employed at EMW or that the questions were improper. Contrary to Becker's contentions, his prior employment is relevant to his training and competency. A person

1. IND.CODE § 16–9.5–1–1 *et seq.*

in the medical profession will have different skills and experience depending upon where that person has been employed. After direct examination, Becker had left the jury believing that his anesthesiologist experience was entirely hospital-based, which was not true. Additionally, Becker's failure to testify about his prior work experience at EMW, when he gave an otherwise detailed history of his anesthesiological experience, goes to his credibility as a witness. Since Becker testified on direct examination as to his prior employment, there was no error in cross-examining him regarding the same. *See Davis v. Eagle Product, Inc.* (1986), Ind.App., 501 N.E.2d 1099, 1107, *trans. denied* (cross-examination is appropriate means to "elucidate, modify, explain, contradict, or rebut" direct testimony).

■ Even if the trial court abused its discretion by concluding that any prejudice was cured by the admonishment, the trial court's denial of Becker's motion for mistrial would still be proper. The steps in the procedure to preserve an issue regarding counsel's misconduct for appellate review are:

" '(1) To *promptly* interpose and state their objection, if reasonably required, to the objectionable language or argument, and request the court to so instruct the jury as to counteract any harmful effect of such language or argument, and if granted, and such instruction was not sufficient to cure the error, follow such action by a motion to have the submission set aside; (2) to *promptly* object to the improper language or argument of counsel, and move to set aside the submission, stating reasons why the harm done could not be cured by any action the court might take in the matter.' "

*Lawson v. Cole* (1954), 124 Ind.App. 89, 92, 115 N.E.2d 134, 136 (emphases added). In the case at bar, Becker failed to advise the court promptly at the time of the admonishment that he believed it to be insufficient or move for a mistrial. Instead, Becker accepted the admonishment and without further objection, the Estate proceeded with its cross-examination. It was not un-

til after the lunch recess that Becker moved for a mistrial. We do not consider this prompt action. Moreover, Becker failed to object to the testimony regarding EMW, and he may not now predicate error on the admission of the testimony. *See Trinity Lutheran Church, Inc. v. Miller* (1983), Ind.App., 451 N.E.2d 1099, 1104, *trans. denied* (when party failed to object to testimony or request an admonishment, argument that the trial court erred in not granting a mistrial waived). Hence, we conclude that the trial court's admonishment properly removed any harmful effect, and the trial court did not abuse its discretion in overruling Becker's untimely motion for a mistrial.

*Issue Two*

■ Next, Becker argues that the trial court erred in prohibiting him from questioning his own witness, Dr. Bentz, about Dr. Bentz's past testimony in medical malpractice cases. We find no error.

On direct examination Becker attempted to elicit testimony from Dr. Bentz that he had testified in one other medical malpractice case as a witness for the plaintiff; hence, Becker argues, this shows that Dr. Bentz was unbiased and a more credible witness than the Estate's expert, Dr. Jefferies. However, neither Dr. Bentz's credibility nor qualifications were attacked by the Estate and put in issue to allow Dr. Bentz's testimony regarding his own credibility. *See Peoples Trust and Saving Co. v. Cohen* (1947), 117 Ind.App. 472, 480, 73 N.E.2d 366, 369 ("The mere contradiction of the testimony of a party in a civil action does not permit the party contradicted to support his testimony by proof of his good character for truth and veracity"). Additionally, the Estate stipulated to Dr. Bentz's qualifications as an expert witness. The trial court did not err in sustaining the Estate's objection to the testimony.

*Issue Three*

Becker also argues that the trial court's refusal to allow Becker *ex parte* conferences with Plemmons' treating physicians was reversible error. We disagree.

The trial court has broad discretion in ruling on the grant or denial of discovery motions and will be reversed only for an abuse of discretion. *Keesling v. Baker and Daniels* (1991), Ind.App., 571 N.E.2d 562, 566, *trans. denied.* In the case at bar, Becker filed a pretrial motion for a protective order requesting the trial court to authorize *ex parte* conferences with Plemmons' treating physicians, Dr. Grossman and Dr. Sligar, and the pathologist, Dr. Engle. Although the record does not disclose any ruling or order from the trial court upon the motion, we will address the issue as Becker alleges that the trial court orally denied the motion on the basis of the physician-patient privilege. Initially, we note that where, as here, a party-patient places a condition in issue, he waives the physician-patient privilege as to "... all matters causally or historically related to that condition, and information which would otherwise be protected from disclosure by the privilege then becomes subject to discovery." *Owen v. Owen* (1990), Ind., 563 N.E.2d 605, 608. However, a party does not waive the privilege as to the party-patient's entire medical record. *Id.* Information unrelated to the condition and irrelevant to the cause remains privileged, and therefore, protected from discovery. *Id.*

The methods of discovery allowed in Indiana are set forth in Ind.Trial Rule 26(A)(1)–(5). Discovery methods include oral and written depositions, interrogatories, production of documents, and requests for admissions. T.R. 26(A). Nowhere in our trial rules does it provide for informal *ex parte* conferences; hence, the trial court did not abuse its discretion in denying Becker's motion for a protective order. *See Miles v. Farrell* (N.D.Ill.1982), 549 F.Supp. 82, 84 (As a general rule physician may not discuss patient's medical condition with opposing counsel except pursuant to discovery authorized under applicable rules of civil procedure); *Petrillo v. Syntex Laboratories, Inc.* (1986) 148 Ill.App.3d 581, 587–606, 102 Ill.Dec. 172, 176–191, 499 N.E.2d 952, 956–971, *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3232, 97 L.E.2d 738 (public policy favoring physician-patient privilege confidentiality justified prohibition against *ex parte* communications); *State ex rel. Klieger v. Alby* (1985), 125 Wis.2d 468, 373 N.W.2d 57, 60–61 (private conferences are not included within the scope of discovery). Moreover, Becker was not prohibited from using authorized methods of discovery to obtain information from Plemmons' treating physicians. We find no abuse of discretion.

*Issue Four*

Finally, Becker argues that the jury's verdict was contrary to the weight of the evidence. In reviewing an allegation that there is insufficient evidence to support the jury's verdict, we view the evidence in a light most favorable to the verdict and consider all reasonable inferences to be drawn therefrom. *Parke County v. Ropak, Inc.* (1988), Ind.App., 526 N.E.2d 732, 739, *trans. denied.* We neither reweigh the evidence nor evaluate the credibility of witnesses. *Id.* If the record contains substantial evidence of probative value, we will not disturb the jury's verdict. *Id.*

Becker is merely asking us to reweigh the evidence which we will not do. There was substantial evidence of probative value to support the jury's verdict in favor of the Estate. The Estate's expert, Dr. Jefferies, testified that Becker failed to conform to the requisite standard of care in the administration of anesthesia to Plemmons. Record at 682. More specifically, he testified that Becker failed to make sure that Plemmons was "breathing properly or being breathed for properly" during his surgery; caused Plemmons to suffer a progressive lack of oxygen over the course of several minutes; and, this resulted in a destruction of the brain from the lack of oxygen. Record at 682–686. Jefferies also testified that for Plemmons' brain to be destroyed totally, Becker must have failed to monitor Plemmons' condition for a period of time. Record at 683. Dr. James Engle, the pathologist who performed Plemmons' autopsy, also testified that upon review of Plemmons' hospital records and lab reports, Plemmons' cardiac arrest may

have been the result of "... mechanical under-ventilation, that means, assisting him in his breathing ventilation and over-sedation with drugs or anesthetics leading to brain depression." Record at 904–905.

In addition, the printout from the Dinamap recorder combined with the testimony introduced by the Estate, supports the Estate's theory that sometime between 8:16 and 8:21 a.m., 51 minutes after the Dinamap machine had been turned on, Plemmons had no recordable blood pressure or heart rate. *See* Record at 721–22. However, the hospital records show that the code for cardiac arrest was not called until 8:30 a.m., when Becker stated that he needed assistance. Record at 737–38. Becker would have us discount the Estate's witnesses in favor of his own, but this we cannot do. Assessing the credibility of witnesses is a function of the jury and not ours on appeal.

Affirmed.

ROBERTSON and CONOVER, JJ., concur.