FILED

Jul 31 2013, 6:43 am

CLERK
of the supreme court,
court of appeals and
tax court



**FOR PUBLICATION**

ATTORNEYS FOR APPELLANT:

**DAVID C. JENSEN**
**ALYSSA STAMATAKOS**
**TRENTON W. GILL**
Eichhorn & Eichhorn, LLP
Hammond, Indiana

ATTORNEYS FOR APPELLEE:

**TIMOTHY S. SCHAFER**
**TIMOTHY S. SCHAFER, II**
**TODD S. SCHAFER**
Schafer and Schafer
Merrillville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DON H. DUMONT, M.D., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  45A05-1207-CT-384 |
| | ) | |
| PENNY DAVIS and NICOLE ANDERSON, | ) | |
| as Co-Administratrixes of the Estate of | ) | |
| CHARMITTA JORDAN, Deceased, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Jeffrey J. Dywan, Judge
Cause No. 45D11-0702-CT-31

**July 31, 2013**

**OPINION – FOR PUBLICATION**

**BAKER, Judge**

Charmitta Jordan passed away at the age of twenty-five after suffering from a rare genetic disease that required nearly one hundred hospitalizations in seven years. Upon her death, Jordan's sisters, Penny Davis and Nicole Anderson ("the Plaintiffs"), were appointed co-administratrixes of her estate, and they filed a wrongful death action against Don H. Dumont, M.D. and Community Hospital, alleging that each violated the standard of care with respect to Jordan's treatment.[1] Following a six-day trial, the jury returned a verdict for the defendants, and the Plaintiffs requested a new trial based on Dr. Dumont's counsel's alleged failure to disclose the identification and opinions of two expert witnesses prior to the disclosure deadline. Finding that Dr. Dumont's counsel committed misconduct, the trial court set aside the judgment on the verdict and ordered a new trial.

On appeal, Dr. Dumont argues that the trial court erred because the allegedly undisclosed opinion of his first expert witness was given during cross-examination by the Plaintiffs' counsel. Dr. Dumont also claims that the Plaintiffs waived this claim because they failed to object to the expert's testimony. With regard to his second expert, Dr. Dumont contends that even if he did commit misconduct, the Plaintiffs have failed to show prejudice because the trial court granted the Plaintiffs' motion to strike the testimony from the record and admonished the jury not to consider it, thus making a new trial unnecessary. Dr. Dumont also maintains that the decision to grant a new trial was error to the extent that this decision to grant a new trial was based on statements made by

---

[1] Because Community Hospital does not participate in this appeal, we limit our recitation of the facts primarily to those concerning only Dr. Dumont.

2

jurors showing actual prejudice to the Plaintiffs because a jury's verdict may not later be impeached by voluntary juror statements.

We agree with each of Dr. Dumont's contentions and conclude that the trial court erred by granting the Plaintiffs a new trial. Accordingly, we reverse the judgment of the trial court.

## FACTS

### The Hospitalization

Charmitta Jordan was admitted to Community Hospital in Munster after arriving at its emergency room in severe pain on September 2, 2001. Like her nearly one hundred hospital admissions from 1994 to 2001, Jordan presented with symptoms of severe abdominal pain, nausea, vomiting, diarrhea, chest pain, shortness of breath, a sore throat and cough, blood oxygen saturation of ninety-three percent, an elevated heart rate of 125 beats per minute, and an elevated respiration rate of forty breaths per minute.

Jordan was admitted to the hospital, and Dr. Dumont, a pulmonologist or "lung specialist," became Jordan's treating physician. Tr. p. 355. Having treated Jordan during previous hospitalizations, Dr. Dumont was aware that Jordan suffered from a condition called hereditary angioedema (HAE) that often presented with the above symptoms. HAE is a rare genetic disease in which patients are missing the C-1 inhibitor enzyme or protein. The absence of this protein can result in significant attacks of extreme swelling, often of the hands, feet, abdomen, and airway. Dr. Dumont was also aware that in 1995, Jordan had undergone a surgery to remove some of the soft tissue in her throat to prevent

3

the risk of asphyxiation during an HAE attack. However, not all of the soft tissue in and around Jordan's airway could be removed.

On September 3, 2001, Jordan's heart rate, respiration rate, and blood oxygenation level stabilized into the normal range, but she continued having severe abdominal pain. Jordan typically rated her abdominal pain as a ten on a scale from one to ten. Dr. Dumont ordered that Jordan's pain be treated with Demerol to be given as needed.

On the evening of September 7, 2001, Jordan began experiencing shortness of breath. She was offered oxygen but refused it. At the time, Jordan had an oxygen saturation level of ninety-eight or ninety-nine percent. Jordan also complained of a "sticking" in her throat, and she had elevated blood pressure and slightly elevated respiration and heart rates. Tr. p. 539. A nurse observed some swelling of Jordan's airway, but by the time Dr. Dumont examined Jordan's throat, he was unable to see any swelling. Dr. Dumont ordered an arterial blood gas test and an x-ray of Jordan's airway.

The results of the arterial blood gas test were abnormal, showing a low oxygen level and a low carbon dioxide level in Jordan's blood. It also showed a significantly low oxygen saturation level of sixty-five percent. Dr. Dumont believed that the low levels were due in part to Jordan's obesity. The x-ray showed some swelling of the airway but did not show any "significant obstruction." Id. at 391. Dr. Dumont concluded that the remaining soft tissues in Jordan's airway had swelled and obstructed Jordan's airway but that the swelling had improved prior to his exam and the x-ray. He also believed that

4

Jordan's pain and anxiety had caused her elevated respirations and heart rate. Accordingly, Dr. Dumont attributed Jordan's symptoms on September 7th to her HAE.

On September 8, 2001, Jordan continued to complain that she felt as if something was stuck in her throat and that she was having some difficulty breathing, and she was placed on intermittent oxygen. A few hours later, she was no longer showing any evidence of respiratory distress. Because Dr. Dumont felt that Jordan's HAE was "beyond [his] ability to treat," he attempted to arrange for Jordan to transfer to a Chicago hospital. Tr. p. 452. He was able to schedule a transfer for September 11, 2001.

Jordan's oxygen saturation levels fell to eighty-eight percent on September 9th despite being on intermittent oxygen, but she no longer complained of difficulty breathing. Her heart rate also rose to 118, and her respiration rate was elevated at twenty-nine breaths per minute. Jordan's heart rate "would often go down" after Demerol was given, and her respiratory rate would "sometimes" slow down. Id. at 538. These rates would also improve in response to "coaching to slow her breathing." Id. at 464. Jordan continued to have "intermittent rapid breathing episodes" through September 12th. Id. at 414.

On September 11, 2001, Jordan's laboratory results showed elevated liver enzymes, which indicated that her liver was becoming damaged. She also had elevated potassium. Basically, Jordan's labs suggested that her liver was producing excess enzymes creating an "elevated risk of a bleed or hemorrhage." Tr. p. 719. Thus, Jordan appeared to Dr. Dumont to be at a reduced risk for blood clots. A Doppler ultrasound

5

was going to be performed on September 12, 2001, to test for Budd-Chiari Syndrome, but the test was never completed. Additionally, Jordan's previously scheduled transfer was delayed because no Chicago-area hospitals were accepting transfers on account of the 9/11 terrorist attacks.

On the morning of September 12, 2001, Jordan's respiration rate increased to thirty-two to forty breaths per minute, and she experienced shallow and irregular breathing. After performing an examination, collecting the lab results from tests performed earlier that morning, coaching Jordan through her respiratory distress, and administering Demerol for Jordan's ten-out-of-ten pain, a nurse paged Dr. Dumont. When Dr. Dumont returned the page, he gave the nurse a few orders to carry out for Jordan. However, while Dr. Dumont and the nurse were speaking or shortly thereafter, Jordan was found unresponsive in her hospital bed.

Jordan was pronounced dead at 10:05 a.m. on September 12, 2001, at the age of twenty-five. Dr. Young Kim, the Lake County Coroner, completed the autopsy. He concluded that Jordan died of pulmonary emboli, or blood clots that traveled to her lungs, preventing oxygen from entering her bloodstream and reaching her organs.

The Allegations and Pre-Trial Proceedings

After Jordan's death, the Plaintiffs were appointed as the co-personal representatives of her estate. On December 8, 2006, the Plaintiffs filed a complaint joining as defendants Dr. Dumont and Community Hospital, alleging that Jordan died because the defendants' treatment of Jordan fell below the minimal standard of care.

6

With regard to Dr. Dumont, the Plaintiffs alleged that Dr. Dumont should have recognized the symptoms of pulmonary emboli, should have included pulmonary emboli in a differential diagnosis and run tests to rule it out, and should have treated pulmonary emboli with blood thinners to prevent Jordan's death.

On November 13, 2007, the trial court ordered the parties to identify their expert witnesses by February 29, 2008. Upon Dr. Dumont's motion, this deadline was extended until April 30, 2008. On April 4, 2008, Community Hospital identified Dr. Michael Ehrie as its expert witness and disclosed his opinions.[2] On April 30, 2008, Dr. Dumont identified his expert witnesses, which included Dr. Patrick Fahey, and disclosed their opinions.[3] Dr. Dumont did not list Dr. Ehrie as one of his expert witnesses. On March 23, 2009, the trial court issued its final pre-trial order, which listed each party's disclosed witnesses. The Plaintiffs did not depose either Dr. Ehrie or Dr. Fahey.

On April 8, 2011, Dr. Dumont's counsel advised the Plaintiffs' counsel via a certified letter that he also intended to call Dr. Ehrie as an expert witness for his opinion that "the histological and clinical evidence demonstrate that [Jordan] suffered an[] acute

---

[2] In relevant part, Community Hospital's disclosure of Dr. Ehrie's opinion stated: "All of the signs and symptoms which the Plaintiffs contend were signs or symptoms of a pulmonary embolism were non-specific and not necessarily related to a pulmonary embolism. Rather, all said signs and symptoms could have been related to [Jordan's] other medical conditions. There are no specific signs or symptoms for a pulmonary embolism which are exclusive to that particular issue."

[3] In relevant part, Dr. Fahey's opinion stated: "Dr. Fahey opines that Dr. Dumont met the standard of care. The standard of care did not require Dr. Dumont to suspect that the patient was at risk for or suffering from a pulmonary embolic event because her symptomatology was consistent with her prior admissions and therefore reasonably attributed to being secondary to hereditary angioedema. In short, while the patient at times was noted to be tachypneic, tachycardic, and dyspneic during her admission beginning on September 2, 2001, these signs and symptoms were of no or little predictive value because they were common for this patient." Appellant's App. p. 40.

pulmonary-embolic event." Appellant's App. p. 60. On August 3, 2011, the Plaintiffs' counsel wrote Dr. Dumont's counsel a letter objecting to the addition of Dr. Ehrie as one of Dr. Dumont's expert witnesses. On August 11, 2011, Dr. Dumont filed a motion for leave to examine Dr. Ehrie as an expert witness. In both his earlier letter to the Plaintiffs' counsel and the motion, Dr. Dumont's counsel claimed that Dr. Ehrie's opinions were substantially the same as Dr. Fahey's opinions. Because the Plaintiffs filed no response, the trial court granted the motion on September 7, 2011.

On October 26, 2011, Dr. Dumont's counsel filed a motion to compel production of the autopsy slides that Dr. Kim prepared at the time of Jordan's autopsy on September 12, 2001. The Plaintiffs objected and moved to exclude Dr. Ehrie's testimony "as it relates to the standard of care of Dr. Dumont or the pathology slides." Appellant's App. p. 73. On October 27, 2011, the trial court overruled the Plaintiffs' objection after a hearing. During the hearing, the Plaintiffs objected to Dr. Ehrie's testimony as to his opinion based upon the slides. Specifically, the Plaintiffs' counsel stated: "We don't agree that in the little sneak that we have there [about the histological and clinical evidence]. That wasn't disclosed by anybody, and histological . . . is not history. It's slides." Tr. p. 92.

The trial court found that the Plaintiffs failed to show any surprise or that undue prejudice would transpire to them if Dr. Ehrie was permitted to testify regarding "the subject areas [Dr. Dumont] indicated both in [his] letter to Plaintiffs' Counsel back in April as well as in the motion filed with the Court in August." Tr. p. 103. The trial court

8

also ordered the production of the slides because the slides "were reviewed by Dr. Ehrie earlier" when he first arrived at his disclosed expert opinions. Id. At the conclusion of the hearing, the Plaintiffs' counsel advised the trial court that the Plaintiffs "may call Dr. Kim now, in light of what's happened here today." Id. at 132. Previously, the Plaintiffs' counsel had not planned on calling Dr. Kim because the parties had stipulated to the authenticity of the autopsy report and the cause of Jordan's death being pulmonary emboli.[4]

### The Trial

A six-day jury trial commenced on October 31, 2011. During opening statements, counsel for Community Hospital identified Dr. Ehrie as "an experienced pulmonologist, internal medicine specialist, critical care specialist, and he's a pathologist, who reviewed the tissue slides for the autopsy in this case." Tr. p. 351. During preliminary instructions, the trial court advised the jury not to "consider or speculate" about any evidence that it ordered stricken from the record. Id. at 303.

Dr. Dumont testified that he never suspected that Jordan's symptoms were caused by pulmonary emboli because, even though Jordan presented nearly all of the symptoms of pulmonary emboli during her last few days in the hospital, the symptoms were also consistent with an HAE attack. Jordan also had several symptoms that Dr. Dumont believed were inconsistent with pulmonary emboli, including swelling of the throat,

---

[4] Specifically, the stipulation read: "The parties stipulate to the authenticity and admissibility of the autopsy report and that Charmitta Jordan died as a result of pulmonary emboli dispensing with the necessity of testimony from the pathologist, Dr. Kim." Tr. p. 380.

9

severe abdominal pain, vomiting, and suspected liver damage. Moreover, Dr. Dumont testified that Jordan appeared to be anti-coagulating her own blood, which would have reduced the likelihood that she would be forming blood clots.

The Plaintiffs' expert, Dr. Gary Salzman, opined that Dr. Dumont violated the standard of care in his treatment of Jordan by failing to perform a differential diagnosis, failing to perform any tests to rule out pulmonary emboli, and ultimately failing to diagnose or treat pulmonary emboli. A significant part of Dr. Salzman's testimony concerned Jordan's shortness of breath, low blood oxygenation levels, and abnormal blood gas results. Dr. Salzman was of the opinion that these results could not be explained by Jordan's HAE, thus requiring Dr. Dumont to perform a differential diagnosis that would have included pulmonary emboli.

After cross-examination and at the end of redirect by the Plaintiffs' counsel, the Plaintiffs' counsel sought to ask Dr. Salzman a previously omitted question. When Dr. Dumont's counsel objected, the Plaintiffs' counsel stated:

> Your Honor, I've had some new experts thrown against me as late as this last Thursday. I'd only ask the Court the courtesy, once I'm done here on cross [sic], to be able to recall and ask for one issue and one question that was an oversight on my part on direct. [Dr. Salzman is] leaving town, so I won't be able to recall him."

Tr. p. 665. The trial court overruled the objection.

Dr. Fahey testified as Dr. Dumont's expert pulmonologist. During Dr. Dumont's case-in-chief, Dr. Fahey testified that Jordan's abnormal blood gas results and low oxygenation levels indicated to him that she was suffering from "chronic respiratory

10

alkalosis," meaning that Jordan "ha[d] been breathing more rapidly than normal for at least days, if not longer," that her "abdominal pain [was] frequent enough that it result[ed] in her breathing rapidly blowing down her carbon dioxide" and that her "body ha[d] adjusted to [the low carbon dioxide levels] by getting rid of bicarbonate in order to keep the pH relatively normal." Tr. p. 1324. Dr. Fahey also opined that he would not expect these results in a patient experiencing acute pulmonary emboli because "the pH would be significantly higher." Id.

On cross-examination, the Plaintiffs' counsel pressed Dr. Fahey to explain why the standard of care did not require Dr. Dumont to include pulmonary emboli on a differential diagnosis when Jordan was experiencing all of the symptoms of pulmonary emboli. When Dr. Fahey explained that there were "a number of explanations" for Jordan's intermittent low oxygenation, the Plaintiffs' counsel responded, "Really? What are they? I maybe missed – I missed them. What are they?" Tr. p. 1348. At that point, Dr. Fahey stated that "on physical examination, [Jordan] often had decreased respirations at her lung bases due to the increased abdominal pain limiting how much she could breathe in and out." Id. Dr. Fahey further explained: "[L]ungs are like accordions, and if you don't fully expand them, [they] just play here, the little lung units collapse called atelectasis. That can lead to low oxygen levels." Id. And in response to further probing, Dr. Fahey also stated that "this type of atelectasis isn't apparent on a chest x-ray." Id. at 1349. The Plaintiffs did not object to Dr. Fahey's opinion that Jordan's low oxygen

11

saturation levels were caused by atelectasis, and in fact, repeatedly solicited this opinion from Dr. Fahey throughout the cross-examination.

Next, Dr. Ehrie testified as Community Hospital's expert pulmonologist. Although Dr. Ehrie did not use the term atelectasis, he also concluded that Jordan's low oxygen saturations could have been caused by her HAE. Specifically, Dr. Ehrie testified that due to significant pain, the "oxygen level [of HAE patients] may fall because they can't take in a good deep breath." Tr. p. 1414.

Once counsel for Community Hospital completed its questioning of Dr. Ehrie, Dr. Dumont's counsel began questioning Dr. Ehrie in his capacity as a pathologist rather than as an expert pulmonologist. Dr. Ehrie opined that a massive pulmonary embolism caused Jordan's death at 9:15 a.m. on September 12, 2001. Dr. Ehrie also stated his opinion that Jordan's heart was significantly damaged and enlarged because of blockages in the arteries leading to her heart. Because of the damage to the heart, Dr. Ehrie opined that the pulmonary emboli, which might have been survived by another patient Jordan's age, had caused Jordan to have a heart attack. After Dr. Ehrie gave these opinions, the Plaintiffs' counsel objected, stating that Dr. Ehrie had never been disclosed as an expert pathologist and that the opinions that he had given had not been disclosed during discovery.

In analyzing the Plaintiffs' objection, the trial court stated:

Your motion says his testimony is going to be as a pulmonologist testifying like did Dr. Fahey, who will opine regarding Dr. Dumont's compliance

12

with the standard of care. It doesn't say anything at all that I can see about him coming in and testifying as an expert pathologist.

Tr. p. 1467. The following colloquy then ensued:

[DR. DUMONT'S COUNSEL:] In terms – in terms – I didn't plan on asking him standard of care opinions. That's – that would be duplicative. What we're doing is we're asking him the histological opinions which is [sic] disclosed. This is the issue we went over during the pre-trial hearing.

THE COURT: Where did you disclose his histological opinions to [the Plaintiffs' counsel]?

[DR. DUMONT'S COUNSEL:] As a sudden and unforeseeable acute pulmonary embolic event. This was in April of 2011.

THE COURT: Where did you disclose all these opinions as a pathologist?

[DR. DUMONT'S COUNSEL:] His curriculum vitae, your Honor, is attached.

THE COURT: But where did you disclose these opinions which you are now asking?

[DR. DUMONT'S COUNSEL:] Right here (indicating). Yes, this sentence talks about – this is what we addressed before, a sudden and unforeseeable pulmonary event, embolic event. This is the exact sentence that the Court was directed to when you ruled on this before.

13

[THE PLAINTIFFS' COUNSEL:]      As a pulmonologist, not as a pathologist.

THE COURT:      I took all this as him testifying as another pulmonologist. There's no way you put me on notice of any of this stuff. You could have said he was going to be offering opinion as an expert in conducting autopsies, pathology. You didn't do that here either.

[DR. DUMONT'S COUNSEL:]      Hold on one second, your Honor. We did address this. If you recall, there was a motion to compel . . . because he needed to refresh his recollection as to the slides. His Honor had a question regarding what histological meant. Histological is pathological. We've already addressed the issue.

. . .

THE COURT:      Histological evidence; I took that to mean he was going to review the autopsy results and the clinical evidence, all your medical records, so as a pulmonologist he could give his opinions which were the same as Dr. Fahey's.

Now, if you didn't make it any clearer to me than that, you should have. I'm a little troubled by this all now.

. . .

14

| | |
|---|---|
| [THE PLAINTIFFS' COUNSEL:] | We're being back-doored here. We don't have a pathologist we could have had to respond, your Honor. That's my difficulty here, and I had no idea this was going to happen. I suspected it once we got the motion to compel, but they have just never disclosed. |

Id. at 1467-73.

After hearing argument from both sides, the trial court ordered that further questioning of Dr. Ehrie as a pathologist would not be permitted. The Plaintiffs' counsel also moved to strike Dr. Ehrie's testimony as a pathologist and for an instruction to the jury not to consider that testimony. The trial court granted both requests, and the parties agreed on the wording of a jury admonishment before moving forward. The presentation of the evidence concluded on November 4, 2011.

The jury returned a verdict for the defendants on November 7, 2011, and the trial court entered a judgment on the verdict the same day. On December 5, 2011, the Plaintiffs filed a motion for relief from judgment pursuant to Indiana Trial Rule 60(B)(3). After briefing and oral argument, the trial court granted the motion and ordered a new trial as to Dr. Dumont. Specifically, on June 28, 2012, the trial court entered an order stating in relevant part:

> The Court now finds that Defendant Dumont did not disclose all of the opinions of his expert witnesses as required prior to trial. Further, in failing to disclose all of the opinions of his expert witnesses and in attempting to confront the Plaintiffs with new and previously undisclosed expert witness opinions at trial, Defendant Dumont committed misconduct. Defendant Dumont's misconduct prevented the Plaintiffs from fully and fairly

15

preparing and presenting their case. The Plaintiffs have made a <u>prima facie</u> showing of a meritorious claim, and they are entitled to a new trial as to Defendant Dumont.

Appellant's App. p. 27. The trial court denied the Plaintiffs' motion as it pertained to the Community Hospital. Dr. Dumont now appeals.

DISCUSSION AND DECISION

I. Standard of Review and Trial Rule 60(B)(3) Considerations

A motion for relief from judgment under Indiana Trial Rule 60(B) is a matter within the equitable discretion of the trial court. <u>Outback Steakhouse of Florida, Inc. v. Markley</u>, 856 N.E.2d 65, 72 (Ind. 2006). In reviewing a Rule 60(B) motion, "the trial court must weigh the alleged inequity that would result from allowing a judgment to stand against the interests of the prevailing party in its judgment, as well as those of society at large in the finality of litigation in general." <u>Bowman v. Smoot</u>, 806 N.E.2d 811, 815 (Ind. Ct. App. 2004). We review the trial court's grant or denial of a motion for relief from judgment for an abuse of discretion. <u>Outback</u>, 856 N.E.2d at 72. An abuse of discretion occurs if the trial court's decision was clearly against the logic and effect of the facts and circumstances before it. <u>Wisner v. Laney</u>, 984 N.E.2d 1201, 1205 (Ind. 2012).

In this case, the Plaintiffs sought relief under Rule 60(B)(3) for Dr. Dumont's alleged failure to abide by our discovery rules. Thus, the Plaintiffs were required to show that: (1) Dr. Dumont's discovery responses amounted to fraud, negligent misrepresentation, or misconduct; (2) the fraud, misrepresentation, or misconduct prevented the Plaintiffs from fully and fairly presenting their case at trial; and (3) the

16

Plaintiffs made a prima facie showing of a meritorious claim or defense. Outback, 856 N.E.2d at 74.

Our Supreme Court has held that misconduct may arise from intentional or negligent violations of Indiana's discovery rules. Id. at 73. Furthermore, the trial court is in the best position to gauge whether any alleged misconduct impacts the jury and in what context. Wisner, 894 N.E.2d at 1206. Finally, regarding the requirement for a meritorious claim or defense, "the movant need only 'present evidence that, if credited, demonstrates that a different result would be reached if the case were retried on the merits and that it is unjust to allow the judgment to stand.'" Outback, 856 N.E.2d at 73 (quoting Smith v. Johnston, 711 N.E.2d 1259, 1265 (Ind. 1999)). "A 'meritorious defense' is also established by showing that the judgment was 'unfairly procured.'" Id. at 81 (quoting Schultz v. Butcher, 24 F.3d 626, 631 (4th Cir. 1994)).

## II. Dr. Dumont's Claims

Dr. Dumont alleges that the trial court's finding of misconduct was erroneous because the Plaintiffs, not he, solicited the undisclosed expert opinion of Dr. Fahey relating to atelectasis and because he had been given leave by the trial court to question Dr. Ehrie regarding the histology slides made by Dr. Kim at the time of the autopsy. Furthermore, Dr. Dumont argues that the Plaintiffs waived any claims of surprise regarding Dr. Fahey's testimony because the Plaintiffs' counsel failed to depose him, object to his testimony, or move to strike his responses at trial. Finally, Dr. Dumont maintains that even if the trial court could have found that he participated in misconduct

17

for failing to disclose Dr. Ehrie's expert opinions regarding the autopsy slides in his capacity as a pathologist, the Plaintiffs failed to demonstrate that the misconduct prevented their ability to fully and fairly present their case because the trial court granted their motion to exclude Dr. Ehrie's testimony as a pathologist in its entirety.

At the outset, we note that the trial court did not identify which expert opinions Dr. Dumont failed to disclose in its order granting the Plaintiffs a new trial. As a result, we cannot be certain whether the trial court found that Dr. Dumont committed misconduct by failing to disclose Dr. Fahey's opinion about atelectasis, Dr. Ehrie's opinions as an expert pathologist, or both. Absent special findings, we will uphold a trial court's decision if it is supported by any factual basis or legal theory. Breeden v. Breeden, 678 N.E.2d 423, 425 (Ind. Ct. App. 1997). Therefore, we address each of Dr. Dumont's contentions in turn.

### A. Dr. Fahey's Atelectasis Opinion

As summarized above, Dr. Dumont maintains that he did not commit misconduct by failing to disclose Dr. Fahey's atelectasis opinion because that opinion was not solicited during direct examination but upon cross examination by the Plaintiffs' counsel. Specifically, Dr. Dumont contends that the "Plaintiffs can cite to no case which holds or suggests that a pre-trial disclosure of an expert opinion must be so painstaking and detailed that it must identify the details of the opposing party's cross-examination and provide responses in anticipation of that cross-examination." Appellant's Br. p. 25. Additionally, Dr. Dumont claims that any surprise regarding this opinion was the result

18

of the Plaintiffs' counsel's own neglect because the Plaintiffs' counsel never deposed Dr. Fahey. Finally, Dr. Dumont contends that the Plaintiffs waived any objection to Dr. Fahey's allegedly undisclosed opinion on atelectasis because their counsel failed to object to his testimony during trial, move to strike the testimony, or move for a mistrial.

The primary purpose of Indiana's discovery rules, including the deadlines for disclosing expert opinions, is to prevent unfair surprise to litigants. Wright v. Miller, No. 54S01-1207-CT-430, slip op. at 4 (Ind. June 21, 2013). Although generally parties have no duty to supplement discovery responses that were complete when made, Indiana Trial Rule 26(E)(1)(b) requires supplementation with regard to "the identity of each person expected to be called as an expert witness at trial, the subject-matter on which he is expected to testify, and the substance of his testimony." Ind. Trial Rule 26(E)(1)(b). The Plaintiffs contend that Dr. Dumont violated this requirement by failing to notify them of Dr. Fahey's opinion that atelectasis could have caused Jordan's low oxygenation levels. In support of this contention, the Plaintiffs direct us to Nature's Link, Inc. v. Przybyla, 885 N.E.2d 709 (Ind. Ct. App. 2008).

In Przybyla, a disclosed defense expert witness testified that most of the plaintiff's permanent disability could be attributed to a preexisting degenerative disk disease, which the expert diagnosed the plaintiff as having for the first time during defense counsel's direct examination of the witness. 885 N.E.2d at 712. During cross-examination, the expert admitted that he had not included this diagnosis in either his written report or his deposition testimony that had been given only a few weeks earlier. Id. at 712-13. After

19

the jury verdict, Przybyla moved for a new trial under Rule 60(B)(3), alleging that defense counsel committed misconduct by failing to supplement his discovery responses as to the defense expert's opinions. Id. at 713. Defense counsel admitted to knowing of the expert's revised medical opinion but failing to advise the plaintiff of the new diagnosis before the trial, and the trial court granted a new trial. Id. at 713, 718.

On appeal, this Court affirmed the trial court, noting that the "new medical opinion can rightly be considered a 'Eureka' moment further bolstering [the expert's] earlier testimonial conclusions . . . ." Id. at 717. Additionally, we held that Pryzbyla could not be charged with waiver of the issue for failing to object to the expert's changed testimony because "[a]t the moment [the expert testified about the new diagnosis], Przybyla did not have any time to evaluate whether to seek a continuance, move for a mistrial, or cross-examine [the] expert." Id. at 719.

We agree with Dr. Dumont that several facts in the instant case distinguish it from Przybyla. First, no evidence has been tendered intimating that Dr. Dumont's counsel knew of Dr. Fahey's atelectasis opinion. Indeed, Dr. Dumont's counsel never solicited this testimony from Dr. Fahey; the opinion came out on cross-examination when the Plaintiffs' counsel pushed Dr. Fahey to support his opinion that Jordan's low oxygenation was not caused by pulmonary emboli but could have been caused by another condition related to her HAE. Tr. p. 1348. This testimony was consistent with Dr. Fahey's disclosed opinion. Appellant's App. p. 40. Moreover, we agree with Dr. Dumont that to the extent an expert's opinion is an ancillary one that a party is not planning to solicit

20

during direct examination, it is not misconduct to fail to disclose it unless it played a significant role in the development of the expert's opinion or it contradicts an earlier disclosed opinion.

Second, in Przyblya, the expert's deposition was taken a few weeks prior to the trial, and his opinion changed dramatically in those few weeks. Nevertheless, the plaintiff's counsel failed to disclose the changed opinions. In this case, however, Dr. Dumont disclosed Dr. Fahey's opinions more than years before the trial date, yet the Plaintiffs never deposed Dr. Fahey to clarify any of his disclosed opinions or to test how he might respond during cross-examination regarding what they believed to be a gap or a weakness in Dr. Dumont's defense. Appellant's App. p. 38-41; Tr. p. 1712. In fact, it appears that the Plaintiffs' decision not to depose Dr. Fahey might have been a tactical one so that the Plaintiffs could, during closing statements, make a big deal about how they had not needed to depose any of the defense experts because "[t]he truth is so clear." Tr. p. 1712.

Because there is no proof that Dr. Dumont knew specifically of Dr. Fahey's atelectasis opinion and in light of the Plaintiff's failure to depose Dr. Fahey, we cannot conclude that Dr. Dumont's failure to disclose Dr. Fahey's atelectasis opinion led a "Eureka" moment orchestrated by Dr. Dumont. See Johnson v. Wait, 947 N.E.2d 951, 962 (Ind. Ct. App. 2011), reh'g denied, trans. denied (holding that plaintiffs failed to establish prejudice by the trial court allowing the testimony of an expert disclosed after the deadline when the plaintiffs had an opportunity to depose the expert but did not avail

21

themselves of the opportunity to do so).  And in the absence of a "Eureka" moment orchestrated through the misconduct of a party, we must conclude that here the Plaintiffs waived their objection to Dr. Fahey's testimony regarding atelectasis because they failed to object to it at trial, seek a continuance, or move for a mistrial.  See Ind. Evidence Rule 103(a) (requiring a timely objection to preserve an alleged error on appeal).

### B.  Dr. Ehrie's Opinions as a Pathologist

Having determined that no misconduct arose from Dr. Dumont's failure to disclose Dr. Fahey's atelectasis opinion, we now turn to Dr. Dumont's contention that a new trial should not have been predicated on Dr. Ehrie's testimony as a pathologist because any prejudice caused by that testimony was cured by its exclusion and by the jury admonishment to which the Plaintiffs specifically agreed.

We first observe that exclusion of an expert witness's testimony is a sanction available to the trial court to use in its discretion when a party violates our rules of discovery.  Ind. Trial Rule 37(B)(2).  We therefore review the trial court's decision to exclude an expert witness's testimony for an abuse of that discretion, and we will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or if the trial court has misinterpreted the law.  Wright, No. 54S01-1207-CT-430, slip op. at 8.

Nevertheless, in reviewing a trial court's decision to exclude an expert witness based on a violation of a discovery order, we keep in mind that "'in Indiana there is a marked judicial deference for deciding disputes on their merits and for giving parties

22

their day in court, especially in cases involving material issues of fact, substantial amounts of money, or weighty policy determinations.'" Id. at 5 (quoting Charnas v. Estate of Loizos, 822 N.E.2d 181, 185 (Ind. Ct. App. 2005)). Additionally, "[w]hen the offending conduct is primarily attributable to counsel and not the client, and prejudice to the opposing party is slight, due consideration should be given to sanctions directed primarily at counsel which seek to minimize prejudice to the client and the merits of the case, while appropriately incentivizing proper future behavior of counsel." Id. at 7.

Here, we believe that the trial court's exclusion of Dr. Ehrie's testimony as a pathologist in its entirety was an abuse of discretion. Although Dr. Dumont's counsel disclosed its intention to examine Dr. Ehrie well beyond the pre-trial order's deadline for disclosing expert witnesses, the disclosure was still made six months before the trial date. Appellant's App. p. 60-61. At that point, the Plaintiffs had more than enough time to depose Dr. Ehrie regarding his opinions as they pertained to Dr. Dumont's treatment of Jordan. However, the Plaintiffs did not respond to Dr. Dumont's correspondence until August 2011, at which time Dr. Dumont requested leave from the trial court to examine Dr. Ehrie. Id. at 63, 65-67. Because the Plaintiffs never submitted a response to this motion, the trial court granted Dr. Dumont's request. Id. at 68.

Furthermore, during the pre-trial hearing on Dr. Dumont's motion to compel release of the pathology slides in October 2011, less than a week before trial, the Plaintiffs' counsel voiced his suspicions that Dr. Dumont wished to examine Dr. Ehrie outside of his previously disclosed expertise in pulmonology. Tr. p. 86-96. In fact, the

23

Plaintiffs' counsel highlighted for the trial court that Dr. Dumont's reference to Dr. Ehrie's histological opinions in his April 2011 disclosure referred to the pathology slides. Id. at 91-92. But when the trial court upheld its previous decision allowing Dr. Dumont's counsel to examine Dr. Ehrie, the Plaintiffs' counsel did not request a continuance so that he could depose him or at least be better prepared to respond to any new pathological opinions. Instead, the Plaintiffs' counsel merely advised the trial court that the Plaintiffs "may call Dr. Kim now, in light of what's happened here today." Id. at 132. However, during trial, the Plaintiffs did not call Dr. Kim either as part of their case-in-chief or as a rebuttal witness. Nevertheless, despite the stipulation dispensing with the necessity of Dr. Kim's testimony as to the authentication of the autopsy report, the Plaintiffs' counsel chided the defendants during closing arguments for not calling Dr. Kim, hinting that Dr. Kim would have agreed with everything the Plaintiffs said. Id. at 1709.

Based on this chain of events and the Plaintiffs' counsel's apparent suspicion that Dr. Ehrie was going to testify as a pathologist but failure to prepare for that contingency, we are not convinced that Dr. Ehrie's testimony was prejudicial to the Plaintiffs' case. The situation we are confronted with here is not analogous to the situation in Przybyla where the innocent party was unaware that an expert witness's opinions had changed until the midst of that expert's testimony. Rather, it appears that the Plaintiffs' counsel had plenty of time before trial to develop a strategy to combat any undisclosed opinions of Dr. Ehrie. Moreover, any prejudice that did arise would likely have been attributable to Dr. Dumont's counsel rather than directly to Dr. Dumont himself. Thus, because the

24

Plaintiffs were not unduly surprised by Dr. Ehrie's testimony as a pathologist, the trial court erred by excluding the testimony in its entirety. See Wright, No. 54S01-1207-CT-430, slip op. at 9 (holding that a trial court's exclusion of a plaintiff's replacement expert witness was an abuse of discretion when, although the previous expert was left off the plaintiff's pre-trial witness list, the defendants knew that the plaintiffs had intended to use that expert witness, and there was no trial date set when the replacement expert was disclosed, thus allowing the defendants sufficient time to prepare a response to the new expert). Consequently, we conclude that the trial court erred by granting the Plaintiffs a new trial.

Nevertheless, even if the trial court was correct that Dr. Dumont's counsel committed misconduct, we would still believe that the trial court should not have granted the Plaintiffs' request for a new trial. Rather, the error was remedied when the Plaintiffs' counsel objected to Dr. Ehrie's testimony, the trial court excluded the testimony in its entirety, and the jury was timely admonished not to consider Dr. Ehrie's testimony that had been elicited by Dr. Dumont's counsel.

Generally, we presume that jurors will abide by a trial court's instruction not to consider certain evidence. Becker v. Plemmons, 598 N.E.2d 564, 567 (Ind. Ct. App. 1992). However, there are situations where the prejudice resulting from improper testimony cannot be adequately remedied by an order striking the testimony from the record and an admonishment to the jury not to consider the evidence. In these situations, the proper procedure is for the prejudiced party to promptly request a mistrial. Id. at 568.

25

We acknowledge that, when considering a Rule 60(B) motion to set aside a judgment, a trial court is in a better position to determine whether misconduct affected the jury and to what extent. Wisner, 984 N.E.2d at 1206. Here, though, when the Plaintiffs' counsel objected at trial, he moved only for Dr. Ehrie's testimony elicited by Dr. Dumont's counsel to be stricken from the record and for an admonishment to the jury not to consider that testimony. Id. at 1479. Moreover, the Plaintiffs' counsel specifically agreed to the wording of the jury admonishment and did not request a mistrial. Id. at 1484, 1486. Instead, the Plaintiffs waited nearly a month after the verdict for the defense had been entered before requesting a new trial pursuant to Rule 60(B)(3).

"A party may not, by action or inaction, await the verdict and then seek to set it aside for error that could have been averted or corrected." Beverly Enters., Inc. v. Spragg, 695 N.E.2d 1019, 1022 (Ind. Ct. App. 1998). And when a party accepts an admonishment as a remedy to improper testimony without also making a prompt motion for a mistrial, that party cannot later complain that more should have been done to eliminate the prejudice arising from the testimony. See Becker, 598 N.E.2d at 568 (holding that a defendant's motion for a mistrial made after a lunch recess was insufficiently prompt to warrant a new trial when before lunch the defendant accepted a jury admonishment without further objection).

Finally, part of the Plaintiffs' argument for why Dr. Dumont's counsel's misconduct warranted a new trial was that the Plaintiffs had suffered actual prejudice that had not been cured by the jury admonishment. Specifically, the Plaintiffs alleged that

26

their counsel "learned after the verdict while talking with the jury that the jury did, in fact, consider Dr. Ehrie's new, undisclosed and stricken opinions in their decision." Appellant's App. p. 89. In <u>Ward v. St. Mary Medical Center of Gary</u>, our Supreme Court stated that "a jury's verdict may not be impeached by the testimony of the jurors who returned it." 658 N.E.2d 893, 894 (Ind. 1995). Accordingly, if and to the extent that this statement of "actual prejudice" influenced the trial court to grant the Plaintiffs' request for a new trial, the trial court erred. "[A] jury trial . . . is eroded if a trial court judge can employ a jury's explanatory statement to vacate its verdict." <u>Id.</u> at 895.

Thus, we conclude that, even assuming that Dr. Dumont's counsel committed misconduct by attempting to add a new expert witness after the deadline set forth in the pre-trial order, the trial court erred by granting the Plaintiffs a new trial on the basis of Dr. Ehrie's stricken testimony.

III. Conclusion

In sum, we do not believe that either Dr. Fahey's allegedly undisclosed opinion about atelectasis or Dr. Ehrie's testimony in his capacity as a pathologist supported the trial court's finding that Dr. Dumont's counsel committed misconduct warranting a new trial. Moreover, we find that the Plaintiffs waived their objection to Dr. Fahey's undisclosed opinions by failing to object to his testimony at trial. Finally, we conclude that because the Plaintiffs accepted a jury admonishment with regard to Dr. Ehrie's testimony without also moving for a mistrial, and the Plaintiffs did not establish actual

surprise resulting from his testimony, the trial court erred by granting the Plaintiffs a new trial.

The judgment of the trial court is reversed.

MAY, J. and MATHIAS, J., concur.