# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2018, 10:23 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Crystal Sells,<br>*Appellant-Defendant,*<br><br>*v.*<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | July 30, 2018<br><br>Court of Appeals Case No.<br>48A02-1704-CR-927<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable Mark Dudley, Judge<br><br>Trial Court Cause No.<br>48C06-1501-F3-37 |

**Bradford, Judge.**

# Case Summary

[1] In December of 2014, emergency personnel were dispatched to an Anderson house, inside which they found fifteen-year-old and developmentally-disabled M.S. near death, unresponsive and without a discernible heartbeat. Crystal Sells and her parents had been caring for M.S., who weighed only fifty pounds, was severly malnourished, and was only saved from death by the use of extreme measures, including the administration of fluids through a hole drilled into her shin bone. The State charged Sells with three counts of Level 3 felony neglect of a dependent and three counts of Level D felony neglect of a dependent.

[2] Approximately one week before trial, the State sought disclosure regarding the anticipated testimony of Micki Rushton, an anticipated expert witness for Sells. Sells revealed only that Rushton was expected to testify about "general principles concerning family dynamics[,]" and the trial court ultimately declined to allow her to testify. At trial, Sells sought to cross-examine a police detective about whether the Indiana Department of Child Services ("DCS") may have investigated Sells as a possible child in need of services ("CHINS") in 2010. Sells sought to pursue the line of questioning to bolster her defense that, to the extent that she neglected M.S., she did so because she was also being abused by her father. The trial court declined to allow Sells to pursue the line of cross-examination. A jury convicted Sells as charged. The trial court entered judgment of conviction on one count of Level 3 felony neglect of a dependent and one count of Class D felony neglect of a dependent and imposed an

aggregate sentence of twelve years of incarceration. Sells contends that the trial court abused its discretion in excluding the testimony of Rushton and disallowing her cross-examination of the police detective and that the State failed to produce sufficient evidence to sustain her convictions. Because we disagree, we affirm.

# Facts and Procedural History

[3] In December of 2014, twenty-one-year-old Sells and fifteen-year-old M.S. lived with Joetta and Steve Sells, Sells's mother and adoptive father, in Anderson. Steve is M.S.'s grandfather and legal custodian. M.S. suffers from a chromosome deletion disorder which causes improper brain-function development. M.S.'s mental developmental age has been estimated at the young elementary level or as low as two years old. M.S.'s condition was diagnosed in 2011 during treatment for developmental delay and issues gaining weight. At the time, M.S. weighed sixty-four pounds.

[4] M.S.'s situation grew steadily worse in the years following her diagnosis, as she was subjected to neglect and abuse, which came to light on December 1, 2014. During the morning of December 1, 2014, Sells was at home with M.S. Sells went into M.S.'s upstairs bedroom and "notice[d] [M.S.] fell down and […] wasn't acting right[.]" Ex. 26A p. 38. Sells was not "sure when [M.S.] fell down[.]" Ex. 26A p. 38. Sells called Joetta, who returned home, and they "tried to pull [M.S.] out of it" but "nothing was working[.]" Ex. 26A p. 38. Joetta called Steve and told him to come home. Sells and Joetta brought M.S.

downstairs, attempted to clean her up, and waited for Steve to arrive. They first attempted to call the doctor that diagnosed M.S. in 2011, but eventually called 911.

[5] Paramedics were dispatched to the Sells' residence with a report that a fifteen-year-old female had suffered a seizure and was unconscious. They were met by Steve, who claimed that M.S. had fallen and passed out but had regained consciousness. The paramedics found M.S. on the living room couch "unresponsive, pulseless, and apneic[.]" Tr. Vol. III p. 131. M.S. appeared emaciated; smelled of feces and urine; and was "cold, clammy, lifeless[,]" and "her pupils were fixed [and] dilated" with no response to light. Tr. Vol. III p. 133. "Clinically speaking, she was dead[.]" Tr. Vol. III p. 136. An electrocardiogram indicated that M.S.'s heart was "quivering" or shaking in ventricular fibrillation instead of pumping blood. Tr. Vol. III p. 136. The paramedics attempted to resuscitate M.S. using CPR and transported her to St. Vincent's Anderson Hospital.

[6] When they arrived at the hospital at 12:51 p.m., the receiving doctor continued CPR. The emergency room doctor observed M.S. to be "very skeletal looking […] like a holocaust victim" and that she smelled of feces and urine. Tr. Vol. VI p. 115. When M.S.'s underwear was removed, the doctor observed "stool everywhere" and leaves. Tr. Vol. VI p. 118. M.S. had a "bony prominence" with "ulcerative lesions down her thoracic spine" and "not an ounce of fat[.]" Tr. Vol. VI p. 119.

[7]     While resuscitating M.S., doctors performed respiratory therapy and provided intravenous fluids. Doctors had difficulty administering intravenous fluids due to M.S.'s frail state, so they drilled into her shin and administered fluids directly into her bone marrow. M.S. was provided with a large amount of glucose, as her blood-glucose level was critically low. After approximately eight more minutes of CPR and receiving glucose, M.S. developed a pulse and began to moan. M.S. had not eaten any time recently and was in "literally end stage starvation." Tr. Vol. VI p. 130. M.S.'s body had consumed its own fat and muscle to create calories, but those methods had been exhausted. M.S. also appeared to be in septic shock, possibly caused by her open wounds being in contact with her feces.

[8]     After M.S. was stabilized, she was transported to St. Vincent's Children's Hospital in Indianapolis. Upon arrival, M.S. was found to weigh approximately fifty pounds, an appropriate weight for a five- or six-year-old child. M.S. was placed on a ventilator to aid her breathing and given an arterial line for constant blood pressure monitoring. The doctor explained that M.S.'s body was "wasted[,]" it "takes a long time" for a person to get to her condition, and she would not have been able to walk. Tr. Vol. III pp. 239, 240. The doctor explained that M.S. had been unconscious because she was "hibernating" as a "normal response [to] limit your movement in order to conserve energy." Tr. Vol. III p. 242. The treating physician determined that there was no relationship between M.S.'s malnourishment and her

chromosome disorder. M.S. was in intensive care for approximately two weeks and stayed at the hospital for months.

[9] Meanwhile, when M.S. was taken to the hospital, officers from the Anderson Police Department went to St. Vincent's Anderson and received consent to search the home from Steve. Steve also provided officers a letter written by M.S.'s doctor in 2011 regarding her chromosome disorder and explained he did not want the officers "to think this is about child abuse[.]" Tr. Vol. IV p. 20. When police arrived to search the residence, officers noticed a smell of "[u]rine, feces[, and] dead tissue" before even entering the residence. Tr. Vol. IV p. 194. Sells met the officers at the front door, invited them inside, and told them that "the house was being cleaned and prepared for an adoption of a child that lived there." Tr. Vol. IV p. 83. Officers could smell a cleaning solvent but could not see evidence of cleaning as the house "was filthy. It stunk. […] There [were] articles of clothing laying everywhere. [I]t was just in disarray." Tr. Vol. IV p. 84. Sells told the officers that she had tried to feed M.S. oatmeal that morning, but that she would not eat. Sells took Officer Chad Purciful to the base of the staircase in the living room and claimed that that was where M.S. had fallen. Sells also showed Officer Purciful a bed on the first floor where she claimed that M.S. slept. Sells claimed that M.S. never went upstairs.

[10] When Officer Purciful went upstairs, he noticed that the odor was getting stronger, all of the upstairs doors had padlock assemblies on the outside of the doors, and a mounted camera was pointed at one of the rooms. Sells explained that there were locks on the doors because a female who previously stayed with

them stole from them. Upon opening the door to the room where Sells claimed some dogs were staying, Officer Purciful was nauseated by the smell of urine, feces, and dead tissue. Officer Purciful observed a mattress leaned up against a wall, an unplugged space heater, and an oatmeal bowl. There was human hair, smeared feces, and blood on the floor. Dirty blankets with fecal matter were piled in the center of the room. Sells told the officers that the dogs had made the mess, the blankets were for the dogs, and the blood was because the "dogs are in heat[.]" Tr. Vol. VII p. 187. Subsequent testing showed that the blood contained M.S.'s DNA.

[11] Later the same day, Sells provided two formal statements to police. In her first statement, Sells claimed that M.S. was "doing okay" this morning and "maybe just was tired" then she "fell off the [living room] couch" in Sells's presence. Ex. 25A pp. 11, 12. Sells denied that M.S. had been by the stairs and claimed that M.S. had been sleeping on the couch "while we're remodeling." Ex. 25A p. 17. Sells claimed M.S. had eaten a "whole plate" of food at a recent Thanksgiving dinner but had only "wanted oatmeal and a peanut butter sandwich" the day before they called 911. Ex. 25A p. 20. She claimed M.S. was offered three meals a day and eats regularly, but "she's not gaining [weight] because of the chromosome disorder." Ex. 25A p. 25.

[12] During the second statement, which included an advisement of rights, Sells acknowledged that M.S. slept upstairs at night and was locked upstairs day and night. Sells admitted she found M.S. on the ground when she was bringing a heater into the room. Sells claimed that she lied because she was scared of

Steve and claimed Steve had "hit [her] a couple of times" when she had attempted to "stand up for" her mother. Ex. 26A pp. 39, 40. Sells also claimed that Steve had physically abused M.S. including pulling her down the stairs by her hair. Sells described Steve as a "monster," but also acknowledged that "[she] deserve[d] the punishment" for the treatment of M.S. Ex. 26A p. 34.

[13] The next day, Sells gave a third statement to police in which she claimed that Steve had been locking M.S. in a bedroom since 2012. For the last year, M.S. was often locked in with a bucket and not allowed to use the family's bathroom. Sells claimed the conditions became progressively worse, with Steve not allowing Sells or her mother to care for M.S. Sells described Steve abusing M.S. on a near-daily basis, including pulling her down the stairs and slamming her into the floor. During this statement, Sells claimed that neither she nor her mother ever abused M.S., they were providing M.S. with two or three meals a day, and they would attempt to sneak her food. Sells acknowledged that her mother was not able to go upstairs to M.S.'s room due to health problems.

[14] On January 8, 2015, Defendant was charged with three counts of Level 3 felony aiding, inducing, or causing neglect of a dependent; Level 3 felony aiding, inducing, or causing criminal confinement; Level 3 felony criminal confinement; Class D felony criminal confinement; and Class D felony battery. On November 28, 2016, the State amended the charges to three counts of Level 3 felony neglect of a dependent and three counts of Level D felony neglect of a dependent.

[15] Jury trial was held on February 21 through March 3, 2017. On the first day of trial, the State moved to exclude testimony from "Micki Rushton, MSW." Appellant's App. Vol. III p. 116. The State explained that Sells had identified Rushton as an expert witness but had failed to provide discovery regarding her intended testimony, despite an order compelling the disclosures. The State explained that the only discovery provided was Rushton's curriculum vitae and a representation in a February 14, 2017, email that Rushton "'has not produced any reports and we have not taken any statements from her. We anticipate her testimony to involve general principles concerning family dynamics.'" Appellant's App. Vol. III p. 117. The State requested clarification and specifically requested a synopsis of her expected testimony. The defense responded that its prior email had already provided a summary of Rushton's anticipated testimony.

[16] On the seventh and eighth days of trial, the court addressed the State's motion to exclude Rushton and ultimately granted it. The court explained that Sells's pretrial disclosure that Rushton would discuss general principles concerning family dynamics "covered the topic but not the opinions or the facts." Tr. Vol. VIII p. 126. The Court concluded that "it is improper to have an expert come in and testify with neither side, apparently, knowing what her opinions are or what facts she's basing it on." Tr. Vol. VIII p. 127.

[17] Sells's nephew Steven Davis, who was nineteen years old in December of 2014, testified that he was at the Sells' house five days a week while his mother worked. Davis was on disability and could not be left alone due to a mental

condition. Davis remembered that M.S. was in her room most of the time because otherwise she would "steal from my aunt and grandma[.]" Tr. Vol. VII p. 31. Davis once entered M.S.'s room to help Sells fix a light and observed that the room had no bed and there was fecal matter on the floor. Davis was at the house the morning of December 1, 2014, and recalled that M.S. started moaning around 9:00 a.m. and was brought downstairs already not moving and unresponsive. Davis recounted the significant delay before anyone called 911 and that Sells and Joetta told him to tell the police that M.S. was never upstairs. Sells also enlisted Davis to help clean the house "[b]ecause the cops [were] going to show up." Tr. Vol. VII p. 49.

[18]     During testimony from Anderson Police Detective Mark Brizendine, Sells attempted to ask on cross-examination if the officer was aware of an allegation that Sells and M.S. were identified in a CHINS filing in 2010: "you were aware that there was a CHINS filing in [2010] specifically identifying M.S. and [Sells]?" Tr. Vol. VII p. 246. The State objected that this question was not proper cross-examination because it was "beyond the scope" of the officer's testimony. Tr. Vol. VII p. 246. During a bench conference, defense counsel explained that he believed there were CHINS allegations regarding Sells and M.S., but a CHINS proceeding was only filed regarding M.S.:

> I anticipate the testimony will be: that there was a[n] allegation that [Sells] and M.S. were both children in need of services. There was actually only a CHINS filed against M.S. The specific allegation was she was malnourished. And the factors around that were that her parents were not taking her to the doctor.

> Once she was ordered to go to the doctor, she went to the doctor, and she got, uh, and she was able to gain weight again.

Tr. Vol. VIII p. 3.

[19] The State responded that any allegations that Sells was suspected to be a CHINS in 2010 were too remote in time and substance to relate to the charges. The Court ruled that Sells could ask the officer about the prior CHINS proceeding from 2010 regarding M.S. but not Sells. Detective Brizendine then testified that while he was aware of a 2010 CHINS proceeding alleging malnutrition with regard to M.S., he "did not physically look at the reports." Tr. Vol. VIII p. 20. Sells did not *voir dire* Detective Brizendine for purposes of an offer to prove regarding any allegation that Sells may have been alleged to be a CHINS at some point.

[20] The jury found Sells guilty as charged. On March 27, 2017, the trial court entered judgment of conviction on one count of neglect of a dependent as a Level 3 felony and one count of neglect of a dependent as a Level D felony. The trial court sentenced Sells to ten years of incarceration for Level 3 felony neglect of a dependent and two years for Level D felony neglect of a dependent, to be served consecutively.

# Discussion and Decision

# I. Whether the Trial Court Abused its Discretion in Disallowing Certain Testimony

"We review evidentiary rulings for abuse of discretion resulting in prejudicial error." *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015) (citing *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003)). "A trial court abuses its discretion when its ruling is either clearly against the logic and effect of the facts and circumstances before the court, or when the court misinterprets the law." *Id.* However, constitutional challenges receive *de novo* review. *See King v. State*, 877 N.E.2d 518, 521 (Ind. Ct. App. 2007); *see also Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013).

Criminal defendants in Indiana have the federal and state constitutional right to present evidence in support of their defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."); *see also Sanchez v. State*, 749 N.E.2d 509, 515 (Ind. 2001) ("[T]he constitution of our state requires that a defendant have the opportunity to present evidence on a mens rea element or any other element or recognized defense."). This right "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

This right, however, is not absolute. *Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001). "The accused does not have an unfettered right to offer [evidence]

that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Ill.,* 484 U.S. 400, 410 (1988)). Constitutional violations have only been found where "arbitrary" rules, *i.e.*, "rules that excluded important defense evidence but that did not serve any legitimate interests[,]" unreasonably limit a defendant's ability to present a defense. *Holmes v. S.C.*, 547 U.S. 319, 325 (2006). In other words, the right to present a defense is abridged by rules that "infringe upon a weighty interest of the accused" and "are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 324 (quotation omitted).

## A. Evidence Regarding Allegations of Previous Abuse of Sells

[24] Sells contends that the trial court abused its discretion in declining to allow her to cross-examine Detective Brizendine regarding whether DCS had substantiated claims that she had also been abused by Steve and Joetta in 2010. Sells claims that this denial undercut her ability to establish her trial defense that her will was overcome by Steve and Joetta's abuse and neglect of her. This argument, however, is based on the unsubstantiated premise that the testimony she sought to elicit from Detective Brizendine would have tended to show any such thing.

[25] Sells's trial counsel stated that he anticipated Detective Brizendine to testify that there was an allegation made in 2010 that both Sells and M.S. were CHINS, but the record belies this claim. When asked about this, Detective Brizendine

testified only that he was aware of a "report filed" in a CHINS case involving M.S. from 2010, but admitted that had not actually looked at any reports. Tr. Vol. IX p. 21. Sells did not make an offer to prove that Detective Brizendine was aware of any CHINS filing involving Sells or any other allegations of abuse, nor did she proffer documentary or any other type of evidence tending to establish that either one of those things ever occurred. "In order to preserve the exclusion of evidence for appellate review, a defendant must make an offer to prove, setting forth the grounds for admission of the evidence and the relevance of the testimony." *Warr v. State*, 877 N.E.2d 817, 822 (Ind. Ct. App. 2007), *trans. denied*. In short, even if we assume, *arguendo*, that such evidence would have been admissible, nothing in the record, admitted as evidence or not, tends to establish that Sells was ever alleged to be a CHINS, much less that Detective Brizendine knew anything about it. Sells has failed to preserve this claim for appellate review.

## B. Rushton's Testimony

[26]    Sells contends that the trial court abused its discretion in declining to allow Rushton to testify, while the State argues that her exclusion was proper based on Sells's failure to disclose the nature of her anticipated testimony. Trial courts have broad latitude with respect to discovery matters, and their rulings receive great deference on appeal. *Cain v. State*, 955 N.E.2d 714, 718 (Ind. 2011) (citing *Williams v. State*, 714 N.E.2d 644 (Ind. 1999)). Due to the fact-sensitive nature of discovery issues, a trial court's ruling is cloaked with a strong presumption of correctness. *Morse v. Davis*, 965 N.E.2d 148, 160 (Ind. Ct. App.

2012), *trans. denied*. The primary factors that a trial court should consider when addressing a discovery violation are "whether the breach was intentional or in bad faith and whether substantial prejudice has resulted." *Id*. (citing *Wiseheart v. State*, 491 N.E.2d 985, 988 (Ind. 1986)). Exclusion of an expert witness's testimony is a sanction available to the trial court to use in its discretion when a party violates the rules of discovery. *See Dumont v. Davis*, 992 N.E.2d 795, 808 (Ind. Ct. App. 2013), *trans. denied*. This Court will affirm a trial court's rulings absent "clear error and resulting prejudice." *Morse*, 965 N.E.2d at 160 (citing *Williams*, 714 N.E.2d at 649).

[27] Indiana Trial Rule 26(B)(4) permits a party to seek a summary of anticipated expert testimony:

> A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

Trial Rule 37(A)(3) states that evasive or incomplete answers are "to be treated as a failure to answer."

[28] Here, the trial court reasonably concluded that Sells failed to adequately disclose the anticipated testimony of Rushton. On February 13, 2017, or eight days before trial, the State filed a motion to compel, explaining that it had already "requested any and all discovery from [Sells] relating to Micki Rushton" on January 23, 2017, but had received no responsive discovery.

Appellant's App. Vol. III p. 17.  The State asked Sells be compelled to provide "discovery regarding their proposed expert Micki Rushton [i]ncluding but not limited to, her credentials, any statements taken from her, and any and all reports she has created in preparation for her testimony[.]"  Appellant's App. Vol. III p. 17.

[29]  On February 15, 2017, the Court granted the State's motion to compel discovery.  The subsequent discovery exchange was detailed in the State's February 21, 2017, motion to exclude:

> 7.  On February 14, 2017, [Sells] sent the undersigned Deputy Prosecutor an email attaching Micki Rushton's curriculum vitae and informed the State that "Micki has not produced any reports and we have not taken any statements from her.  We anticipate her testimony to involve general principles concerning family dynamics."
>
> 8.  On February 18, 2017, […] the State renewed its request for discovery relating to Micki Rushton's expected testimony, specifically stating, "I'm not sure what you meant by 'we anticipate her testimony to involve general principles concerning family dynamics', so please send me a synopsis of her expected testimony."
>
> 9.  On February 19, 2017, the State followed up with that request and received the following response, "I sent you and Dan an email on Feb. 14 with Micki's CV attached and anticipated testimony."

Appellant's App. Vol. III p. 117.

[30]  While Sells's pretrial disclosure that Rushton would discuss "general principles concerning family dynamics" discloses the subject matter of the testimony, it

falls short of informing the State of anticipated opinions or the facts, or the bases of those opinions. The trial court agreed, concluding that it was "improper to have an expert come in and testify with neither side, apparently, knowing what her opinions are or what facts she's basing it on." Tr. Vol. VIII p. 127. The trial court reiterated its reason for exclusion at sentencing, explaining that seven days before trial Sells essentially told the court "that one (1) you didn't know the opinion of your expert and (2) you hadn't bother[ed] to talk with her and you had no ability to explain to the State or myself what this particular expert witness was going to say." Tr. Vol. IX p. 147–48. We conclude that Sells's repeated refusal to provide substantive discovery regarding the nature of Rushton's anticipated expert testimony supported the trial court's conclusion that a discovery violation had occurred.

[31] Sells claims that she met her discovery obligations by disclosing Rushton's identity and explaining the nature of her anticipated testimony during a conference in chambers on November 14, 2016. The State, however, contested Sells's memory of the off-the-record hearing, recalling defense counsel "wouldn't even tell us, well, who it was and [what] it was about. So, she certainly didn't get into the nature of this woman's testimony." Tr. Vol. VIII p. 110. The trial court recalled the hearing much as the State had when describing it two months later: "all I was told [was] a bald statement that the Sells anticipates maybe, possibly calling an expert witness" and that the identity of the possible expert was never provided. Tr. Vol. I pp. 83–84. The question of whether the required disclosure occurred seems to us to be a preliminary

question about whether evidence is admissible, which is for the trial court to decide. Ind. Evidence Rule 104(a) ("The court must decide any preliminary question about whether […] evidence is admissible."). Sells gives us no reason to question the trial court's recollection on this point. In any event, even if we were to accept Sells's version of the November conference, it does not explain why she did not simply provide the same information again when ordered to two months later. In summary, the record supports the trial court's conclusion that Sells committed a discovery violation for failing to timely disclose information regarding Rushton's anticipated testimony.

[32] As for the trial court's sanction, we recognize that exclusion of a witness is "'[t]he most extreme sanction [and] should not be employed unless the defendant's breach has been purposeful or intentional or unless substantial and irreparable prejudice would result to the State.'" *Vasquez v. State*, 868 N.E.2d 473, 476 (Ind. 2007) (quoting *Wiseheart*, 491 N.E.2d at 991). Trial courts retain the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith or substantial prejudice. *D.D.K. v. State*, 750 N.E.2d 885, 888 (Ind. Ct. App. 2001).

[33] Under the circumstances of this case, we conclude that the record is sufficient to sustain a finding that Sells's noncompliance was purposeful, warranting exclusion. Despite a motion to compel and a further request from the State, Sells did not ever divulge anything more than the general subject matter of Rushton's anticipated testimony. It is worth noting that while Sells claimed repeatedly to have already provided the State with more detailed discovery, she

did not explain why she was unable to simply supply this information again when ordered to by the trial court. We conclude that, under the circumstances of this case, we cannot say that exclusion of Rushton's testimony amounted to an abuse of discretion.

## II. Sufficiency of the Evidence

[34] In reviewing a challenge to the sufficiency of the evidence, this Court does not reweigh the evidence or assess the credibility of witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). This Court will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007) (citing *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).

[35] To convict Sells of Level 3 felony neglect of a dependent, as charged, the State was required to prove that between July and December of 2014, (1) Sells; (2) having the care of dependent M.S., whether assumed voluntarily or because of a legal obligation; (3) knowingly or intentionally placed M.S. in a situation that endangered M.S.'s life or health, resulting in serious bodily injury to M.S. Ind. Code § 35-46-1-4(a), -4(b). To convict Sells of the offense as a Class D felony, as charged, the State was required to prove that between October 2011 and June 2014, (1) Sells; (2) having the care of dependent M.S., whether assumed

voluntarily or because of a legal obligation; (3) knowingly or intentionally placed M.S. in a situation that endangered M.S.'s life or health. Ind. Code § 35-46-1-4(a).

[36] Sells was charged with placing M.S. "in a situation that endangered M.S.'s life or health[.]" Appellant's App. Vol. III p. 103; *see* Ind. Code § 35-46-1-4(a)(1). Pursuant to that statutory provision, the danger to the dependent must be actual and appreciable. *Perryman v. State*, 80 N.E.3d 234, 250 (Ind. Ct. App. 2017). "In order to obtain a conviction for neglect of a dependent, the State must show that the accused was subjectively aware of a high probability that the accused placed the dependent in a dangerous situation." *Hastings v. State,* 560 N.E.2d 664, 666–67 (Ind. Ct. App. 1990), *trans. denied.* "[T]he State need only prove the accused was aware of facts that would alert a reasonable caregiver under the circumstances to take affirmative action to protect the child." *Dexter v. State*, 945 N.E.2d 220, 224 (Ind. Ct. App.), *aff'd in relevant part*, 959 N.E.2d 235, 237 (Ind. 2012).

[37] The State presented ample evidence that Sells, along with her parents, placed M.S. in a situation that endangered her health. Fifteen-year-old M.S. was particularly vulnerable as she suffers from a condition causing severe developmental problems, of which Sells was well aware. Sells also acknowledged to police that she was supposed to be caring for M.S. when Steve was working and that her mother was not able to cook or go upstairs to M.S.'s room due to a knee surgery and fibromyalgia. When M.S. was discovered by paramedics on December 1, 2014, she was suffering end-state starvation,

weighed approximately fifty pounds, and was only saved from death by extreme measures. The State presented testimony from M.S.'s treating physician that it would have taken some time for her condition to deteriorate to that degree. Even on the day when M.S. nearly died, however, Sells waited some time before calling 911. Reasonable inferences that can be drawn from this evidence are that (1) M.S. had been subjected to a long-term deprivation of life-sustaining food, medical care, and other necessities; (2) Sells, as one of her primary caregivers, was aware of M.S.'s perilous condition; and (3) Sells took no affirmative action to help M.S. until it was almost too late.

[38] Moreover, Sells actively attempted to conceal the crimes by attempting to clean the house before police arrived, lying to them once they did, telling Davis to claim that M.S. had never been upstairs, and providing inconsistent and changing accounts when questioned by police. The physical evidence, Sells's admissions, and her attempts to conceal or minimize her crimes establish her culpability. Sells notes her self-serving claims to police that she provided M.S. with three meals a day, but the jury was under no obligation to credit those claims, and, in any event, they are undercut by M.S.'s obviously dire physical condition on December 1, 2014. Sells's argument amounts to nothing other than an invitation to reweigh the evidence, which we will not do. *See McHenry*, 820 N.E.2d at 126.

[39] This case is distinguishable from *Fisher v. State*, 548 N.E.2d 1177 (Ind. Ct. App. 1990), in which we concluded that there was insufficient evidence of neglect where the defendant was merely aware of abuse but failed to report it. *Id.* at

1179–80. In this case, however, Sells was much more than a passive observer; she was one of M.S.'s primary caregivers and personally subjected her to a dangerous situation by not providing food, medical care, or sanitary conditions during the many hours during which M.S. was directly in her care. Sells's reliance on *Fisher* is unavailing. We conclude that the State produced ample evidence to sustain Sells's convictions for neglect of a dependent.

[40] The judgment of the trial court is affirmed.

Baker, J., and Kirsch, J., concur.