## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 05 2018, 10:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nicholas F. Wallace
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Christina D. Pace
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher L. Figgs, *Appellant-Defendant,* | October 5, 2018 |
| v. | Court of Appeals Case No. 02A05-1710-CR-2405 |
| | Appeal from the Allen Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Frances C. Gull, Judge |
| | Trial Court Cause No. 02D05-1608-MR-3 |

**Barnes, Senior Judge.**

# Case Summary

[1] Christopher L. Figgs appeals his conviction and eighty-year sentence for murder and Level 5 felony carrying a handgun without a license, and the enhancement of his sentence for using a firearm in the commission of a felony resulting in death. We affirm.

# Issues

[2] The issues before us are as follows:

    I.      whether the trial court erred in denying Figgs's motion for a mistrial;

    II.     whether the trial court abused its discretion in admitting evidence due to an alleged discovery violation by the State;

    III.    whether Figgs's sentence is inappropriate in light of the nature of his offenses and his character; and

    IV.    whether the trial court erred when it did not require the jury to reconvene for a bifurcated proceeding regarding Figgs's use of a handgun in the commission of the crime.

# Facts

[3] Figgs and Thomasa Hunter ("Thomasa") had a turbulent six-year romantic relationship. Throughout the relationship, "[Figgs] always threatened [that] he'd do something to [her]." Tr. Vol. III p. 21. Figgs and Thomasa ended their romantic relationship in October 2015, and Thomasa moved in with her

mother, Regina Hunter ("Regina"). Afterwards, Figgs harassed Thomasa and threatened her to dissuade her from dating.

[4] Figgs and Thomasa were involved in multiple violent incidents after their romantic split. On May 22, 2016, Figgs and Thomasa physically fought when Figgs refused to return or pay for Thomasa's silver and black handgun. The fight escalated until a young child called 911 and hung up. The Fort Wayne Police Department responded to the scene and found Thomasa crying and holding her arm. She had visible scratches, bruises around her eyes, and looked "like she had been in a fight." *Id.* at 76. Thomasa told the officers that Figgs had hit her in the face and "[t]ried to run her over" with a car. *Id.* at 78.

[5] On June 28, 2016, Thomasa telephoned her employer, Kenesha Williams, to say that she would not be able to work because of a domestic situation. Williams went to Regina's home "to defuse the whole thing." Tr. Vol. II p. 237. In Williams's presence, Figgs stated that "he didn't give a f*** who [was] over there"; "[Thomasa could] call anybody [she] want[ed] to, he [was] gonna do whatever he want[ed] to"; and that he would "beat [Thomasa's] a**, beat [Williams's] a**, [and] whoever . . . wanted to get in between [them]." *Id.* at 238-39. Figgs then made a hand gesture mimicking firing a gun and told Thomasa, "If I see you with somebody, it's gonna be something. Don't let me catch you. You already know what it is." Tr. Vol. III p. 121.

[6] On June 30, 2016, Figgs threatened to shoot Thomasa. Thomasa called 911, and their fighting escalated until the police arrived. Responding officers encountered

a belligerent Figgs at Thomasa's house, "yelling . . . that he was going to get her and she was gonna pay for this" and "threat[ening] to have a female he knows come over and beat her a** and . . . referring to her as 'b****[.]'" *Id*. at 85.

[7] In the late evening hours of July 5, 2016, Figgs and Thomasa spoke on the phone. Thomasa ended the call, saying that she was going to bed. Hours later, at approximately 1:00 a.m. on July 6, 2016, Thomasa's friend, Edward Kiel ("Kiel") parked his car outside Regina's home on McKinnie Avenue in Fort Wayne. Thomasa joined Kiel in his car, and they smoked marijuana and talked until they fell asleep.

[8] At approximately 1:25 a.m., Figgs called Thomasa's phone. Her daughter, Tamarii, answered that Thomasa was with a friend. Outside, Thomasa awoke in the car to a "distraught" Kiel asking, "Is that your mother****** baby daddy?" *Id*. at 3. Thomasa told Kiel to "drive off." *Id*. As Kiel pulled away from the curb, Figgs fired five gunshots into the car. Kiel was struck twice in the chest and later died from his wounds.

[9] Thomasa ran back to Regina's home for help. Regina and Tamarii were on the porch. As Thomasa ran toward them, Tamarii saw Figgs—dressed in a white shirt, pants, and red shoes—running from the scene and holding a "silver and black" item in his hand. *Id*. at 180. Thomasa shouted for her family to call 911 and said, "[Figgs] shot my friend." *Id*. at 178. Thomasa and Regina ran back to Kiel's car. At approximately 1:44 a.m., Thomasa called Kiel's sister, Crystal Laster ("Crystal"), and told her about the shooting. Officers from the Fort

Wayne Police Department responded to the scene. Thomasa identified Figgs as the shooter in a police interview.

[10] Cell phone data records, from July 3 and 6, 2016, documented nearly two hundred contacts between Figgs's and Thomasa's cell phones; however, Figgs's phone abruptly ceased to be detected by cell phone towers after his last attempt to reach Thomasa at 1:39 a.m. on July 6, 2016.

[11] On August 3, 2016, the State charged Figgs with murder ("Count I"), Level 5 felony carrying a handgun without a license ("Count II") and sought a sentence enhancement for his alleged use of a firearm in the commission of a felony resulting in death ("Count III"). Figgs fled the jurisdiction. On September 12, 2016, law enforcement authorities apprehended him in Alabama. Figgs telephoned Thomasa from jail and warned her not to participate in the State's case. He also prompted another inmate to telephone Thomasa and to tell her "[to] just be quiet about that little situation." State's Ex. 59.

[12] In February 2017, Figgs was tried to a jury; however, the jury deadlocked, resulting in a mistrial. He was retried in August 2017. During the second trial, Regina, Tamarii, Thomasa, and law enforcement witnesses testified to the foregoing facts.[1] Crystal testified that, moments after Kiel was shot, Thomasa told her that "Chris [Figgs] had did it [sic]." *Id.* at 93.

---

[1] At trial, Thomasa gave conflicting testimony: she testified that she was depressed and "c[ould]n't remember a lot of stuff"; that she did not tell Detective Gregory that Figgs shot Kiel; and that she "probably" told the police that Kiel that the shooter looked like Figgs. Tr. Vol. III p. 11. Confronted with her prior,

[13]     In an ensuing sidebar conference, counsel for the State advised that he learned that Crystal would testify as such moments before she took the stand. Outside the presence of the jury, defense counsel alleged that the State had committed a discovery violation that warranted a mistrial. Defense counsel argued as follows:

> There's a prior trial in this case, it's my understanding that [Crystal] testified at that trial. During the course of her testimony, she never was asked, nor did she volunteer any information about knowing who the perpetrator was. [Thomasa], obviously, has testified previously. She's never been asked about saying anything about, you know, that it was [Figgs], because we've never known about that, so we have her testimony.
>
> I've taken [Thomasa's] deposition, and again, I had no reason to ask what she said to Crystal Laster because I had no reason to believe that she said anything because it had never been provided to me. I'm advised that moments before she testified, out in the hallway, the prosecutor, for the first time, asked one more extra question that they'd not previously asked that led to them getting an excited utterance. Again, that comes in as substantive evidence that identifies Christopher Figgs as the shooter, and I believe that they had an obligation to tell me that before she testified, even if they had just walked over and I would have — quite frankly, I would have asked for a recess before she testified to try to figure out where to go with this new information. I believe that it is exculpatory in that it is inconsistent with anything in this entire investigation.
>
> Although the parties have known about this phone call at 1:44 a.m. on the night of, Thomasa's not provided information that she said it was [Figgs], [Crystal]'s not provided information that she said it was [Figgs]. Detectives have spoken to her,

_____

sworn deposition statement that she told the police, "I thought I saw my baby daddy," Thomasa admitted that she "probably did" make such a statement. *Id*. at 13.

uniform[ed] officers have spoken to her. This is the first — she's met with the prosecutor, by her testimony — or questioning from me, at least three times, and even the detective says he's done follow-up with her just to keep her informed, and so this is the first time that we hear this.

* * * * *

Quite frankly, finding out seconds before she testified would have been a little bit more timely than finding out on the stand; nonetheless, I believe that they had an obligation to give me this information. So you did provide us with an opportunity to speak to her for a few minutes. I believe that, you know, this leads to further investigation. We now have to call — you know, we have to go back and talk to Thomasa Hunter to find out what — if she remembers saying it. There's just things that have to be done now to try to determine whether or not this statement that we're hearing on August 16th for the first time is, in fact, a reliable and credible statement. I can't do that in the middle of this trial. I am at an extreme disadvantage at this point, finding this out in the middle of this trial, which is his second trial; so I would ask for a mistrial on the basis that I believe that again this is a discovery violation.

*Id.* at. 100-102.

[14] Counsel for the State countered that a mistrial was inappropriate because he was as surprised by Crystal's testimony as the defense; the statement was not intentionally withheld; the statement was not previously known to the State and, tellingly, was not introduced at Figgs's first trial; and the information was "additional information, but not inconsistent" with other evidence in the record. *Id.* at 102. The trial court responded as follows:

THE COURT: Okay. Well, I appreciate all of your candor, that the State, in fact, did provide all of its discovery and that included within that discovery were the screen shots between [Crystal] and [Thomasa] that were Facebook Messenger and

texts and a telephone call. There is a police report from the morning of the incident that [Crystal] indicated to Officer Bell that she got a phone call from [Thomasa]. I reviewed my notes from her trial testimony previously, she was on the stand five minutes and was strictly a [sic] identification witness on behalf of the State as it related to the victim. * * * * * Clearly, the information was contained within the discovery.

The fact that there was a lack of follow-up I think is just — discovery has changed from the old days where it was just police reports. We now have police reports and cameras and body cameras and video cameras and Facebooks and cell phones and all the rest of the discovery that's mutual between the parties, but it's clearly in there and I'm gonna deny the motion for a mistrial.

I would give you some time — clearly, you need some time to figure out how you wish to cross examine [Crystal]. . . . [F]igure out how it is that you wish to proceed from this point forward; and I'll provide leeway, clearly, to give you the opportunity to cross examine [Crystal] about the failure to divulge this information in the prior trial or at any other time, but it was clearly within the contents of the information that was provided.

*Id*. at 107-08. The trial court allowed defense counsel additional time in which to interview Crystal and a police detective.

[15] Also, during the trial, the State introduced evidence of the three prior incidents of violence between Figgs and Thomasa. Defense counsel objected; the State countered that the evidence "goes to the hostile nature of the relationship, [and the] motive of [Figgs]." Tr. Vol. II p. 233. The trial court admitted the evidence over defense counsel's continuing objections.

[16] At the close of the evidence, the jury considered Count III simultaneously with Counts I and II. Figgs did not object or move for a bifurcated proceeding. The jury subsequently found Figgs guilty as charged. The trial court imposed a sixty-year sentence on the murder conviction, a one-year sentence for Level 5 felony carrying a handgun without a license, and ordered the sentences served concurrently. The trial court also imposed a twenty-year sentence enhancement for Figgs's use of the handgun in the commission of a felony resulting in death. Figgs now appeals.

## Analysis

### I. *Denial of Mistrial for Alleged Discovery Violation*

[17] Figgs argues that the trial court erred in denying his motion for a mistrial following the State's alleged discovery violation. Trial courts have broad latitude with respect to discovery matters, and we afford their rulings great deference on appeal. *Cain v. State,* 955 N.E.2d 714 (Ind. 2011). The trial court is in the best position to assess the effect of discovery violations; accordingly, we will reverse a ruling on discovery matters only when clear error occurs. *Hooper v. State,* 779 N.E.2d 596, 599 (Ind. Ct. App. 2002). "[T]he appropriate standard of review in all instances of prosecutorial failure to disclose evidence [is whether] 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different.'" *Id.*

[18] "When remedial measures are warranted, a continuance is usually the proper remedy. . . ." *Id.*; *see Cain,* 955 N.E.2d at 714. "Failure to alternatively request

a continuance upon moving to exclude evidence, where a continuance may be an appropriate remedy, constitutes a waiver of any alleged error pertaining to noncompliance with the court's discovery order." *Warren v. State,* 725 N.E.2d 828, 832 (Ind. 2000). Here, defense counsel objected to Crystal's testimony, but failed to request a continuance; this issue is therefore waived.

[19] Waiver notwithstanding, "Exclusion of evidence is only appropriate if the defendant shows 'that the State's actions were deliberate or otherwise reprehensible, and this conduct prevented the defendant from receiving a fair trial.'" *Cain,* 955 N.E.2d at 718 (quoting *Warren,* 725 N.E.2d at 832). The record reveals that, moments before she testified in Figgs's second trial, Crystal informed the State that she would testify that Thomasa identified Figgs as the shooter. There is no indication in the record that the State purposely withheld Crystal's statement or intended an ambush of the defense. Figgs has not shown that the State's action was deliberate here. Nor was the State's conduct reprehensible. *See Fosha v. State,* 747 N.E.2d 549, 557 n.9 (Ind. 2001) ("There is no error when the State provides a defendant evidence as soon as the State gains possession of the requested evidence."), *overruled on other grounds, Gutermuth v. State,* 868 N.E.2d 427 (Ind. 2007); *see Warren v. State,* 725 N.E.2d 828, 832-33 (Ind. 2000) (finding no error where State turned over 911 tape as soon as the tape came into the State's possession).

[20] Moreover, the record reveals that the State provided Figgs with sufficient documentary evidence of Thomasa's telephone call and Facebook message exchanges with Crystal to have prompted his further examination of Crystal's

anticipated testimony. Under the circumstances, the trial court did not err in denying Figgs's request for a mistrial due to an alleged discovery violation.

## II. Admission of Evidence Rule 404(b) Evidence

Next, Figgs argues that "the trial court erred by allowing the State to introduce evidence of three incidents of domestic violence between Figgs and Thomasa and allow[ing] Thomasa to testify to prior threats from Figgs in order to prove that he shot and killed Edward Kiel." Appellant's Br. p. 23. Decisions regarding the admission of evidence are left to the sound discretion of the trial court. *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015), *trans. denied*. On appeal, we review the trial court's decision only for an abuse of that discretion, and the court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id.*

Indiana Evidence Rule 404(b) provides:

> (1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses; Notice in a Criminal Case*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

(A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

(B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

[23] Evidence Rule 404(b) is designed to prevent the jury from making the "forbidden inference" that prior wrongful conduct suggests present guilt. *Halliburton v. State*, 1 N.E.3d 670, 681 (Ind. 2013) (citing *Byers v. State,* 709 N.E.2d 1024, 1026-27 (Ind. 1999)). Stated differently, the purpose behind Evidence Rule 404(b) is to "prevent[ ] the State from punishing people for their character, and evidence of extrinsic offenses poses the danger that the jury will convict the defendant because . . . he [or she] has a tendency to commit other crimes." *Bassett v. State*, 795 N.E.2d 1050, 1053 (Ind. 2003).

[24] In assessing the admissibility of evidence under Evidence Rule 404(b), the trial court must first determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and then balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Halliburton*, 1 N.E.3d at 681-82 (citing *Wilson v. State*, 765 N.E.2d 1265, 1270 (Ind. 2002)). The effect of Rule 404(b) is that evidence is excluded only when it is introduced to prompt the forbidden inference of demonstrating the defendant's propensity to commit the charged crime. *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*.

"[P]roof of the defendant's motive to commit the charged crime lends itself to three legitimate theories of logical relevance." "Evidence of motive may be offered to prove that the act was committed, or to prove the identity of the actor, or to prove the requisite mental state."

When evidence of motive is offered for those purposes, "[n]umerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime."

*Embry v. State,* 923 N.E.2d 1, 9 (Ind. Ct. App. 2010) (internal citations and quotations omitted). Such is the case here.

Figgs argues that, because the State did not charge him with a crime against Thomasa, it was error for the trial court to admit evidence of his prior violent acts against her. He argues,

[The three] incidents involved acts of threats and violence allegedly perpetrated between Figgs and Thomasa. If the State had charged Figgs for a crime against Thomasa, then, under the current law, the State would undoubtedly be permitted to admit that testimony as evidence of hostility or jealousy as motive for the crime is admissible. But, in this case, the State seeks to go one step further and make a second inference that is not supported by the evidence. The [S]tate did not allege that Figgs accidentally shot Keil [sic] or would have killed literally anyone one [sic] else that Thomasa came into contact with.

Appellant's Br. p. 24. The upshot of this argument is that Thomasa was not a victim of the shooting because, unlike Kiel, she was not injured or killed. Figgs

thus maintains that, had Thomasa been injured or killed, evidence of his prior acts of violence against her would be admissible to prove motive, but that, because she survived her brush with death, the motive evidence is inadmissible. We cannot agree.

[27] Figgs relies upon *Cook v. State,* 734 N.E.2d 563 (Ind. 2000), for the proposition that "a bad relationship between the defendant and any other person did not bear upon defendant's motive for charged conduct." *Id.* at 23. *Cook* is inapposite here. In *Cook,* Cook was charged with murder for shooting a man, who had previously served as a police confidential informant ("CI"). Cook attempted to introduce evidence of the informant's CI status to suggest that "any number of people would have [had] a motive to harm" him. *Cook,* 734 N.E.2d at 567. In upholding the trial court's exclusion of the evidence, our supreme court reasoned that, although "evidence of motive is always relevant in the proof of a crime," Cook had failed to present any such evidence. *Id.* at 568. The *Cook* court reasoned:

> [Cook's] contention that other patrons in the bar might have had a motive to kill [the victim] is not evidence. . . . Cook has neither argued nor shown that any of the bar patrons was aware that [the victim] at one time acted as a police informant or that any was even acquainted with him. * * * * * Testimony revealed that none of the State's witnesses who were present at the bar on the night of the shooting was the subject of a [CI] drug buy. Absent some evidence linking [victim] to a third party, Cook's statement that someone else had a motive to kill Justice amounts to mere speculation."

*Id*. at 568. The *Cook* court thus rejected Cook's attempt to conjure motive from the tenuous and remote relationships between the CI victim and bar patrons, none of whom were aware of or involved in the victim's CI work.

[28] In the instant case, however, the relationship between Thomasa and Figgs cannot reasonably be characterized as remote. The shooting—and murder— resulted from Figgs firing five gunshots at Kiel *and* Thomasa, as they sat in Kiel's vehicle together. Figgs's jealousy of Thomasa's friendship with another man provided the motive for the shooting; and evidence of Figgs's prior violent acts against Thomasa was probative of the ongoing hostility between them and was admissible to show the motive for shooting and killing Kiel, whom Figgs perceived as a romantic rival. *See id*. ("[W]here a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime."). Based on the foregoing, we conclude that evidence of Figgs's prior violent acts against Thomasa was relevant evidence of Figgs's motive for the shooting that resulted in Kiel's death.

[29] As we have stated above, the evidence of the three incidents of violence was probative of the hostility between Thomasa and Figgs. Thus, the incidents of violence "illustrated the hostile relationship that could have been a motive" for Figgs shooting Kiel. *See Hicks v. State,* 690 N.E.2d 215, 223 (Ind. 1997). Even if we had found otherwise, any error therefrom is harmless.

[30] An error is harmless when it results in no prejudice to a party's "substantial rights." *Durden v. State,* 99 N.E.3d 645, 652 (Ind. 2018). The basic premise of the harmless error rule is that "a conviction may stand when the error had no bearing on the outcome of the case." *Id*. To determine whether an error in the introduction of evidence affected the defendant's substantial rights, we assess the probable impact of that evidence upon the jury considering all the other evidence that was properly presented. *Blount v. State,* 22 N.E.3d 559, 564 (Ind. 2014). If we are satisfied that the conviction is supported by independent evidence of guilt such that there is no substantial likelihood that the challenged evidence contributed to the verdict, the error is harmless. *Id*.

[31] The record establishes, by substantial independent evidence, that Figgs killed Kiel. After Tamarii told him that Thomasa had gone out with someone, Figgs went to her home shortly after 1:00 a.m. on July 6, 2016. Thomasa was asleep in Kiel's vehicle when Kiel asked, "Is that your mother****** baby daddy?" Tr. Vol. III p. 3. Moments later, a gunman fired five shots into the vehicle. Thomasa subsequently identified Figgs as the shooter. Tamarii saw Figgs running from the scene with a silver and black item in his hand. Figgs, who had called Thomasa incessantly in the days preceding the shooting, did not call her again after 1:39 a.m. on July 6, 2016.[2] In light of the foregoing evidence, we

---

[2] Figgs's next contact with Thomasa appears to have been a jailhouse telephone call.

conclude that the jury would have reached the same result even if it had not learned about the prior incidents of violence between Thomasa and Figgs.

### III. *Inappropriateness of Sentence*

[32] Figgs contends that his sentence is inappropriate and invites us to reduce it pursuant to Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this Court that his or her sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224.

[33] We consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence is ordered suspended "or otherwise crafted using any of the variety of sentencing tools available to the trial judge." *Davidson v. State,* 926 N.E.2d 1023, 1025 (Ind. 2010). In conducting our review, we do not look to see whether the defendant's

sentence is appropriate or "if another sentence might be more appropriate; rather, the question is whether the sentence imposed is inappropriate." *Fonner v. State,* 876 N.E.2d 340, 344 (Ind. Ct. App. 2007).

[34]	A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Here, the trial court imposed a sixty-year sentence for Kiel's murder. A person who commits a Level 5 felony shall be imprisoned for a fixed term of between one and six years, with the advisory sentence being three years. Here, the trial court imposed a sentence of one year, ordered served concurrently with Figgs's murder sentence. Where a trier of fact finds that the State has proved, beyond a reasonable doubt, that a person used a firearm in the commission of a felony, the court may sentence the person to an additional fixed term of between five and twenty years. Here, the trial court imposed the maximum enhancement of twenty years. As the State correctly states, Figgs faced a maximum sentence of ninety-one years. The trial court here imposed an eighty-year sentence.

[35]	Regarding the nature of the offense, Figgs fired five gunshots into a vehicle in which his ex-girlfriend was seated with another man, Kiel. Kiel died from injuries sustained in the ambush. As regards Figgs's character, we first consider his criminal history. It is well-settled that "[w]hen considering the character of the offender, one relevant fact is the defendant's criminal history," and "[t]he significance of criminal history varies based on the gravity, nature, and number of prior offenses in relation to the current offense." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied*. Moreover, the trial court may

consider not only the defendant's adult criminal history but also his juvenile delinquency record in determining whether his criminal history is significant. *See Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007).

[36] The record reveals that Figgs was adjudicated a juvenile delinquent for disorderly conduct and resisting law enforcement. As an adult, he has convictions for operating a vehicle without a license (twice), resisting law enforcement (three times), possession of marijuana, public intoxication (twice), carrying a handgun without a license, and disorderly conduct. On two occasions, his suspended sentences have been revoked. His prior criminal history, like the instant offenses, reflects his lack of self-restraint and inability to conform his behavior to the law's requirements. The trial record established that Figgs had a history of terrorizing Thomasa, which culminated in his use of deadly force against her and Kiel.

[37] Based on the foregoing, Figgs's aggregate sentence of eighty years is not inappropriate in light of the nature of the offenses and his character. He has been undeterred by court intervention, has continued to offend throughout his multiple contacts with the criminal justice system, has shown that he has no regard for the rule of law, and his crimes have escalated to the point of murder.

### IV. Bifurcation

[38] Lastly, Figgs argues that the trial court erred when it did not conduct a bifurcated hearing regarding Count III, the sentence enhancement for his use of a firearm in the commission of a felony. Because Figgs did not object to the

jury's consideration of Count III simultaneously with Counts I and II, we conclude that he has waived any argument regarding the bifurcated proceeding. *See Helsley v. State*, 809 N.E.2d 292, 302 (Ind. 2004) (holding that the defendant may not appeal on grounds not distinctly presented at trial). As the State maintains, Figgs neither acknowledges his waiver nor alleges fundamental error here. *See* Appellee's Br. p. 23.

[39] Waiver notwithstanding, we consider whether the trial court's failure to bifurcate constitutes a fundamental error that overcomes the waiver and requires reversal. Fundamental error is a blatant violation of basic principles. *Carden v. State,* 873 N.E.2d 160, 164 (Ind. Ct. App. 2007). The potential for harm must be substantial and deprive the defendant of fundamental due process. *Id*. "The error must be so prejudicial to the rights of the defendant as to make a fair trial impossible." *Id*.

[40] Indiana Code Section 35-50-2-11 provides, in pertinent part, as follows:

> (d) The state may seek, on a page separate from the rest of a charging instrument, to have a person who allegedly committed an offense sentenced to an additional fixed term of imprisonment if the state can show beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense.
>
> * * * * *
>
> (f) If the person was convicted of:
>
> > (1) the offense under subsection (d);

. . .

> in a jury trial, the jury shall reconvene to hear evidence in the enhancement hearing.

[41] The "reconvening" language evinces the need for a bifurcated hearing where evidence that the defendant used a handgun could prejudice the jury in the jury's deliberation of the defendant's guilt. *See Johnson v. State*, 544 N.E.2d 164, 168 (Ind. Ct. App. 1989) (trial court recognized need for bifurcated proceeding to keep evidence of prior conviction of battery from prejudicing jury before enhancement phase of trial), *trans. denied*. Under the instant facts, however, we find that no such danger existed. To prove its murder case, the State had to present evidence to the jury that Figgs used a firearm to shoot Kiel. Under the circumstances, we do not find prejudicial error that made a fair trial impossible for Figgs; nor do we find that there was substantial potential for harm that deprived Figgs of fundamental due process. Accordingly, the trial court did not err when it did not require the jury to reconvene for a bifurcated proceeding regarding Figgs's use of a handgun in the commission of the crime, resulting in Kiel's death.

# Conclusion

[42] The trial court did not err in denying Figgs's motion for a mistrial, in admitting Evidence Rule 404(B) evidence, or in failing to hold a bifurcated hearing regarding the sentence enhancement for his use of a firearm in the commission

of a felony, resulting in Kiel's death. Figgs's sentence is not inappropriate in light of the nature of his offenses and his character. We affirm.

[43] Affirmed.

Vaidik, C.J., and Pyle, J., concur.